**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:18-cv-00558

CENTER FOR BIOLOGICAL DIVERSITY, a non-profit organization,

THE HUMANE SOCIETY OF THE UNITED STATES, a non-profit organization, and

WILDEARTH GUARDIANS, a non-profit organization,

      Petitioners,

vs.

NOREEN WALSH, in her official capacity as the Regional Director of the Mountain-Prairie Region of the U.S. Fish and Wildlife Service,

RYAN ZINKE, in his official capacity as the Secretary of the U.S. Department of the Interior,

JIM KURTH, in his official capacity as the Acting-Director of the U.S. Fish and Wildlife Service,

THE U.S. FISH AND WILDLIFE SERVICE, a federal agency, and

THE U.S. DEPARTMENT OF THE INTERIOR, a federal agency,

      Federal-Respondents.

---

**PETITION FOR REVIEW OF AGENCY ACTION**

---

**INTRODUCTION**

1.      Petitioners bring this civil action against the above named Federal-Respondents under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701, *et seq*., for violations of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321, *et seq*., in funding and facilitating a program to unnecessarily kill black bears and cougars.

2.      On December 2 and December 5, 2016, the Colorado Parks and Wildlife ("CPW") applied for federal assistance to fund two experimental plans aimed at exterminating predators in an attempt to artificially boost mule deer populations:  (1) Addressing Neonate Mule Deer Survival in the Piceance Basin ("Piceance Basin Plan") and (2) Mule Deer Population Response to Cougar Population Manipulation ("Upper Arkansas River Plan") (collectively, "Plans").  Through these applications, CPW requested that the U.S. Fish and Wildlife Service ("FWS") fund 75 percent of the costs for the Plans.  FWS granted the applications, agreeing to fund the Plans at the requested rate.

3.      FWS's grant of federal funds to cover 75 percent of the cost of the Plans is a major federal action requiring compliance with NEPA.  Rather than analyze the environmental impacts of FWS's involvement in the Plans, as required by NEPA, on February 27, 2017, FWS (an agency in the U.S. Department of the Interior) merely adopted an existing Environmental Assessment that Wildlife Services, a wholly different agency program within the U.S. Department of Agriculture, issued in January 2017.[1]  The Environmental Assessment ("2017 Wildlife Services' EA") is not specific to the Plans and instead broadly covers Wildlife Services' statewide program in Colorado.

---

[1] Wildlife Services' January 2017 Environmental Assessment is mistakenly dated as January 2016.

4.      The 2017 Wildlife Services' EA does not adequately analyze the environmental impacts of the Piceance Basin Plan or the Upper Arkansas Plan, and therefore it is insufficient to satisfy FWS's legal requirement to comply with NEPA.  As FWS issued a Finding of No Significant Impact ("FONSI") without properly adopting or supplementing the inadequate 2017 Wildlife Services' EA, Petitioners ask the Court to vacate this FONSI and to remand this matter to FWS for proper environmental review.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction under 28 U.S.C. § 1331 (federal question), 5 U.S.C. §§ 701-706 (Administrative Procedure Act), 28 U.S.C. §§ 2201-2202 (the Declaratory Judgment Act), and 28 U.S.C. § 2412 (the Equal Access to Justice Act).

6.      Venue is appropriate in this judicial district under 28 U.S.C. §§ 1391(b) and (e) because FWS has its Region 6 office in Colorado and a substantial part of the events or omissions giving rise to the claim occurred in Colorado.  Additionally, Petitioners Center for Biological Diversity and WildEarth Guardians both have offices in Denver, Colorado.

7.      This Court has authority to issue the relief requested under 5 U.S.C. §§ 702 and 706, and 28 U.S.C. §§ 2201 and 2202.

## PARTIES

8.      Petitioner CENTER FOR BIOLOGICAL DIVERSITY ("the Center") is a nonprofit organization dedicated to the preservation, protection, and restoration of biodiversity, native species, and ecosystems.  The Center is based in Tucson, Arizona, with offices throughout the country, including in Colorado.  The Center has more than 63,000 members, including 2,169 members who reside in Colorado.  The Center and its members have a long-standing interest in

conserving native carnivores in the American West and routinely advocate for native carnivore conservation and protection. Many of the Center's members enjoy the native species and ecosystems of Colorado, including cougars (also known as mountain lions) and black bears in the Piceance Basin and the Upper Arkansas River areas of Colorado.

9.      Petitioner THE HUMANE SOCIETY OF THE UNITED STATES ("HSUS") is a nonprofit organization headquartered in Washington, D.C., with regional offices and several direct animal care facilities located throughout the country. HSUS is the nation's largest animal protection organization, with millions of members and supporters, many of whom live and recreate in Colorado, including the Piceance Basin and Upper Arkansas River areas. HSUS is committed to protecting and conserving the nation's wildlife, and one of its core campaigns has been protecting native carnivores such as black bears and cougars. Many of HSUS's members benefit directly from observing and being among thriving populations of black bears and cougars in Colorado, including in areas such as the Piceance Basin and the Upper Arkansas River. HSUS has staff that live and work in Colorado, including a staff member who specializes in native carnivore protection.

10.      Petitioner WILDEARTH GUARDIANS ("Guardians") is a non-profit conservation organization dedicated to protecting and restoring the wildlife, wild places, wild rivers, and health of the American West. Guardians has more than 206,000 members and supporters, including 668 members and 8,110 activists who reside in Colorado and recreate in, live in, and otherwise enjoy areas included in the footprint of the Plans. Guardians and its predecessor organization, Sinapu, have a longstanding interest in the preservation and restoration of Colorado's native carnivores. More broadly, Guardians has a long history of working to

protect and restore native carnivore species across the West, including gray wolves, Mexican

wolves, cougars, black bears, grizzly bears, Canada lynx, and wolverine.  Guardians maintains

an office in Denver, Colorado, with eight full-time staffers.

11.     Petitioners, their Board members, staff, members, and supporters place a high

priority on protecting and conserving carnivores in their native habitats and participate in a wide

range of activities—including education, advocacy, scientific study, and litigation—to protect

and conserve carnivores.  Petitioners and their members have long worked to protect black bears

and cougars in the American West and recognize that these carnivores promote healthy

functioning of ecosystems.

12.     To further Petitioners' goals in promoting the conservation and protection of

native carnivores, Petitioners engaged in the public process for the Plans at issue in this case.

For example, Petitioners offered verbal and written comments to the CPW Commission in

opposition to the Plans, educated and engaged Colorado residents about the Plans, and provided

comments on the draft 2017 Wildlife Services' EA.  Petitioners' written comments on the draft

2017 Wildlife Services' EA discussed the EA's flaws in relation to the Plans.  Additionally,

WildEarth Guardians provided a thorough list of questions about the Plans at a CPW meeting in

on September 19, 2016; although a hired moderator assured WildEarth Guardians that CPW

would provide answers to those questions, CPW only posted answers on the agency's website

just days before the CPW December 14, 2016, CPW Commission meeting, with no notice to

WildEarth Guardians.  WildEarth Guardians also provided a formal presentation at the CPW

Commission meeting on December 14, 2016, opposing the Plans and outlining their legal and

scientific flaws.  Petitioner HSUS also wrote several letters to Colorado agencies regarding legal

violations involving the Plans.  On October 14, 2015, HSUS wrote to the Colorado Department of Regulatory Agencies ("DORA") requesting that CPW conduct a cost-benefit analysis on the Plans.  A few days later, DORA informed HSUS that CPW was required to conduct a cost-benefit analysis by November 9, 2015, and on October 23, 2015, DORA informed HSUS that CPW chose to retract the Plans instead.  On December 13, 2016, after CPW renewed its proposal for the Plans, HSUS sent CPW a letter informing the agency that its proposal violated the Colorado State Administrative Procedure Act in failing to provide appropriate opportunity for public review and comment.

13.     Petitioners and members have aesthetic, professional, recreational, and personal interests in conserving and protecting Colorado's native predators, including black bears and cougars. Petitioners and members enjoy attempting to view and photograph black bears, cougars, other wildlife and their signs while recreating in the wild in Colorado. Petitioners and their members recognize the ecological value of native carnivores and their importance to healthy, resilient ecosystems.  Petitioners are committed to protecting Colorado's native carnivores and their habitat.

14.     CPW applied for and was granted substantial funding from FWS, allowing CPW to carry out the Plans authorizing the killing of bears and cougars, diminishing Petitioners' members' opportunities to see and enjoy these animals in the wild.  But for FWS's funding, CPW could not carry out the Plans as proposed.

15.     Petitioners' members have suffered, and will continue to suffer, direct injuries to their professional, recreational, aesthetic, scientific, spiritual, and other interests and activities as a result of FWS's funding of these Plans and its failure to comply with the law.  These are actual,

ongoing, concrete injuries, traceable to FWS's funding of these Plans and its failure to comply

with NEPA, which can only be redressed by the Court.

16.     A favorable decision from this Court would give the public a more meaningful

opportunity to analyze the environmental effects of and submit comments on FWS's funding of

the Plans, and it could lead FWS to a different decision regarding its funding of the Plans.

17.     Federal-Respondent NOREEN WALSH is the Regional Director of the

Mountain-Prairie Region of FWS.  The Regional Director oversees FWS's activities for

Colorado and other states in the Mountain-Prairie Region and signed the FONSI that this Petition

challenges.  She is sued in her official capacity.

18.     Federal-Respondent RYAN ZINKE is the Secretary of the Department of the

Interior.  The Secretary of the Interior is responsible for ensuring FWS complies with the federal

laws at issue in this lawsuit.  He is sued in his official capacity.

19.     Federal-Respondent JIM KURTH is the Acting-Director of the U.S. Fish and

Wildlife Service, and is responsible for ensuring FWS complies with the federal laws at issue in

this lawsuit.  He is sued in his official capacity.

20.     Federal-Respondent THE U.S. FISH AND WILDLIFE SERVICE is a bureau

within the U.S. Department of the Interior.  FWS issued the FONSI that this Petition challenges

and is responsible for the agency actions alleged herein.

21.     Federal-Respondent THE U.S. DEPARTMENT OF THE INTERIOR is the

federal agency that houses FWS.  The Department of the Interior, which oversees FWS's actions,

is responsible for the agency actions alleged herein, and is responsible for applying and

implementing the federal laws at issue in this Petition.

## LEGAL BACKGROUND

### The National Environmental Policy Act

22.     NEPA "is our basic national charter for protection of the environment."  40

C.F.R. § 1500.1(a).  The Council on Environmental Quality ("CEQ") has adopted regulations

implementing NEPA.  Individual agencies have also promulgated regulations and guidance

further interpreting their NEPA obligations.

23.     NEPA's twin objectives are (1) to ensure that agencies take a "hard look" at every

significant aspect of the environmental impact of a proposed action, and (2) to guarantee that

relevant information is available to the public to promote well-informed public participation.

Under NEPA, each federal agency must take a "hard look" at the impacts of its actions prior to

the point of commitment so that it does not deprive itself of the ability "to foster excellent

action."  *See id.* § 1500.1(c).  In this way, NEPA ensures that the agency will not act on

incomplete information only to regret its decision after it is too late to correct.

24.     NEPA requires federal agencies to prepare a detailed Environmental Impact

Statement ("EIS") for all "major Federal actions significantly affecting the quality of the human

environment."  42 U.S.C. § 4332(2)(C).  Federal action includes "projects and programs entirely

or partly financed . . . by federal agencies."  40 C.F.R. § 1508.18(a); *see also id.* § 1508.18(b)(4)

("Projects [defined as "Federal actions"] include actions approved by permit or other regulatory

decision as well as federal and federally assisted activities.").

25.     An agency may first prepare an environmental assessment ("EA") to determine

whether to prepare an EIS or to instead issue a Finding of No Significant Impact ("FONSI").  *Id.*

§ 1508.9.

26.     An agency may only issue a FONSI for actions that have no significant impact on the human environment.  *Id.* § 1508.13.  If an action *may* have a significant effect on the environment, or even if there are substantial questions as to whether it may, the agency must prepare an EIS.  *See id.* § 1508.3.

27.     NEPA's regulations define "significance" in terms of context and intensity.  *Id.* § 1508.27.  Context means the significance of the action must be analyzed in several contexts, including short- and long-term effects within the setting of the proposed action (i.e., site-specific, local impacts).  *Id*. § 1508.27(a).  Intensity refers to the severity of the impact and requires consideration of a number of factors, and NEPA regulations list 10 factors that may generally lead to a significance determination, including (1) whether the action is likely to be highly controversial; (2) whether the effects on the environment are highly uncertain or involve unique or unknown risks; (3) whether the action may have cumulative significant impacts; and (4) whether the action threatens a violation of law.  *Id.* §§ 1508.27(b)(4), (b)(5), (b)(7), (b)(10).

28.     In an EA or EIS, an agency must fully analyze all direct, indirect, and cumulative impacts from a project in its environmental analysis.  *See id.* § 1502.16.  Direct effects include those "which are caused by the action and occur at the same time and place."  *Id.* § 1508.8(a).  Indirect effects include those "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable.  Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use; population density or growth rate; and related effects on air and water and other natural systems, including ecosystems."  *Id.* § 1508.8(b).  Finally, cumulative impacts include those "which result from the incremental impact of the action when added to other past, present, and reasonably

foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id.* § 1508.7.

29. NEPA requires that the information an agency uses in conducting its environmental review is "of high quality," and agencies must "insure the professional integrity, including scientific integrity," of their discussions and analyses, and "shall identify any methodologies used" and "scientific and other sources relied upon" for the conclusions. *Id.* §§ 1500.1(b), 1502.24. "Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." *Id.* § 1500.1(b).

30. NEPA requires an agency to adequately consider alternatives to its proposed action. The agency must "[s]tudy, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E). An agency shall "[r]igorously explore and objectively evaluate all reasonable alternatives," "use the NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment," and "[i]nclude appropriate mitigation measures" to minimize the negative impacts of a project. 40 C.F.R. §§ 1500.2(e), 1502.14(a), (f). This alternatives analysis is considered "the heart of" the environmental analysis. *Id.* § 1502.14.

31. An agency ordinarily must conduct its own NEPA analysis for its own proposed actions. However, there are three situations in which NEPA's implementing regulations permit an agency to adopt a NEPA analysis that another agency prepared.

32.     First, if an agency participated in the preparation of an EIS or EA as a cooperating agency, it may adopt the final document after it has independently reviewed the analysis and determined that it satisfied its own NEPA procedures.  *Id.* § 1506.3(c); *see also* Guidance Regarding NEPA Regulations, 48 Fed. Reg. 34,263, 34,265 (July 28, 1983).

33.     Second, a federal agency may adopt another agency's EIS or EA if the proposed action is substantially the same as that described in the EIS or EA, even if the adopting federal agency was not a cooperating agency because it did not anticipate it would be involved in the project.  40 C.F.R. § 1506.3(b); *see also* 48 Fed. Reg. at 34,265.  In this instance, the adopting agency must not only independently review the EIS or EA to determine that it is current and that its own NEPA procedures have been satisfied, but it also must recirculate the NEPA analysis as a final EIS or EA.  40 C.F.R. § 1506.3(b); 48 Fed. Reg. at 34,265.

34.     Third, if the proposed action is not substantially the same as that covered by another agency's EIS or EA, the agency may adopt the document by circulating it as a draft or as a portion of the agency's draft and then prepare a final EIS or EA.  40 C.F.R. § 1506.3(b); 48 Fed. Reg. at 34,265.

35.     CEQ also encourages agencies to put in place additional mechanisms for adopting EAs that other agencies prepared.  48 Fed. Reg. at 34,265-66.  Under such procedures, the adopting agency would independently evaluate the information contained in the EA, take full responsibility for its scope and content, and publish a FONSI for 30 days of public review before making a final determination as to whether to prepare an EIS.  *Id.* at 34,266.

36.     The Department of the Interior's Department Manual permits Interior to adopt an EA that another agency prepared if, upon independent evaluation, it finds the EA complies with

NEPA and NEPA's implementing regulations.  516 DM 3.6; *see also* 40 C.F.R. § 1506.3(c).

The responsible official may augment the EA if it is not entirely in compliance with NEPA.  516

DM 3.6.  If an official adopts an EA that another agency prepared, that official must prepare an

independent FONSI.  *Id.*

37.     FWS permits itself to adopt another federal agency's EA or EIS "in rare

circumstances" if four criteria are met.  According to FWS, (1) the document to be adopted must

adequately comply with Interior Department/FWS NEPA procedures and guidance; (2) FWS

should be a cooperating agency with the other federal agencies in the preparation of their EA/EIS

in accordance with 40 C.F.R. § 1501.6; (3) the other federal agency's EA/EIS must adequately

address FWS's actions and alternatives being considered; *and* (4) the other agency's EA/EIS

must meet the NEPA standards prescribed in 40 C.F.R. § 1506.3, discussed above.  550 FW

2.6B.  FWS notes that "[t]his requires close coordination between the involved agencies."  *Id.*

38.     Where FWS adopts an EA from another federal agency and was not a cooperating

agency, FWS must re-circulate the Final EA for public review.  550 FW 2, Exhibit 8.

39.     An agency must prepare a supplemental NEPA analysis if "[t]he agency makes

substantial changes in the proposed action that are relevant to environmental concerns" or

"[t]here are significant new circumstances or information relevant to environmental concerns and

bearing on the proposed action or its impacts."  40 C.F.R. § 1502.9(c)(1).  The agency is required

to circulate all supplements for public comment.  *Id.* § 1502.9(c)(4).

## The Administrative Procedure Act

40.     The APA provides for judicial review of final agency action for persons adversely

affected or aggrieved by the agency action.  5 U.S.C. § 702.

41.     The APA requires a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).

## The Pittman-Robertson Wildlife Restoration Act

42.     The Wildlife Restoration Act, 16 U.S.C. §§ 669-669k, also known as the Pittman-Robertson Act, encourages the Secretary of the Department of the Interior to cooperate with states in wildlife-restoration projects. 16 U.S.C. § 669. Such cooperation may include extending financial or technical assistance to carry out projects that benefit wildlife and wildlife habitat.

43.     When states request funding for wildlife projects, the Secretary of the Department of Interior must first approve a wildlife conservation and restoration program and may provide funding for up to 75 percent of the program's estimated cost. 16 U.S.C. § 669c(d)(3).

## FACTS

## The Piceance Basin Predator Management Plan

44.     The Piceance Basin in northwest Colorado is home to a range of native wildlife, including cougars and black bears. Cougars and black bears are ecologically important predators that help support balanced and high-functioning ecosystems.

45.     Mule deer also occupy the Piceance Basin. Mule deer is one natural prey source for cougars and black bears.

46.     The Piceance Basin contains reserves of coal, natural gas, and oil shale, and extensive energy development in the area has significantly altered and fragmented wildlife habitat. Ongoing development will likely cause this habitat degradation to continue and intensify into the future.

47.     The widespread energy development has negatively impacted the mule deer population in the Piceance Basin.  During the early 1990s, the mule deer population declined by about one-third, which scientists believe was due to the loss and degradation of forage in its winter range caused by energy development.

48.     A study that CPW conducted compared data between two time periods:  1982-1990 (before the decline of the mule deer population), and 2008 to the present.  The study does not include any data from the time period during the dramatic decline of the mule deer population in the early 1990s.

49.     In comparing data between the two time periods, CPW found that early winter fawn recruitment (the number of fawns becoming adults, as reflected by December fawn counts) has declined.

50.     Extensive and invasive energy development in the Piceance Basin has not ceased, yet based upon these data, CPW simply hypothesizes that availability of forage no longer limits mule deer in its winter range, and instead, predation is limiting this population's ability to recover to historic levels.

51.     Although the mule deer population has not reached historic levels, its population in Colorado is increasing.  For example, the statewide post-hunt population estimate was 436,000 in 2015, up from a population estimate of 424,000 in 2014.

52.     CPW now proposes to kill cougars and black bears in an experiment aimed at artificially boosting mule deer populations.

53.   CPW claims that these outdated predator control techniques will help the agency confirm whether predation is impacting fawn survival rates, or whether fawns dying from predation are weaker and would otherwise likely have died prior to adulthood.

54.   The proposed Piceance Basin Plan will last three years, from spring 2017 through December 2019.  CPW proposes using specialized contractors, namely Wildlife Services, to kill cougars and black bears during May and June in each of the three years.  According to CPW, Wildlife Services will use cage traps, culvert traps, foot snares, and hounds to capture and subsequently shoot the cougars and black bears to execute the Piceance Basin Plan.

55.   Hounding involves chasing black bears or cougars with packs of trailing dogs until the target animal retreats into a tree or rock ledge to escape, enabling the contractor to shoot the animal at close range.  Hounds often trespass onto private lands; disturb or kill non-target wildlife, including vulnerable kittens or cubs; and are sometimes injured or killed themselves.

56.   Traps and snares do not discriminate between species and often catch non-target animals, including domestic animals and endangered species.

57.   CPW will focus lethal removals on and around the Roan Plateau, an area that rises to over 3,000 feet above the Colorado River Valley.  Scientists recognize the Roan Plateau as one of the most biologically diverse areas in Colorado.

58.   Although intense energy development surrounds the Roan Plateau, the Plateau itself remains undeveloped.

59.   According to the 2017 Wildlife Services' EA, CPW originally predicted that 5 to 10 cougars and 10 to 20 black bears would be killed annually.  As noted below, these numbers increased after the 2017 Wildlife Services' EA was finalized.

60.     CPW estimated the total cost of the Piceance Basin Plan to be $644,293.68.  FWS

has agreed to federally fund 75 percent of the project—or $483,220.30—through the use of

grants under the Pittman-Robertson Wildlife Restoration Act (16 U.S.C. §§ 669-669k).

61.     FWS will periodically review and reimburse CPW's expenditures for the Piceance

Basin Plan.

### The Upper Arkansas River Predator Management Plan

62.     The Upper Arkansas River Plan area includes two deer Data Analysis Units

("DAUs") located in central Colorado:  D-16 and D-34.  D-16 is located on the north side of the

Arkansas River between the towns of Leadville and Cañon City.  It includes Game Management

Units ("GMUs") 49, 57, 58, and 581.  D-34 is located on the south side of the Arkansas River in

the Wet Mountains/Sangre De Cristo Range.  It includes GMUs 69, 691, 84, 86, and 861.

63.     The mule deer population in the Upper Arkansas River Plan area is currently

estimated to be 11,247—below CPW's long-term population objective of 16,000 to 20,000

deer—and CPW asserts that population growth "*may be limited to some extent* by cougar

predation on fawns and adult does," and similarly, "*might partially be limited* by cougar

predation."

64.     CPW asserts that from 1999-2014, 6.4 percent of collared does and 7.5 percent of

collared fawns died from cougar predation.  CPW also "suspects" that out of the reported

mortalities for all collared deer, one-third of the mortalities were from unknown causes, and

some of those may have been due to cougar predation.

65.     Like the Piceance Basin Plan, CPW acknowledges that the Upper Arkansas River

Plan is purely experimental, stating,"[t]he impact of cougar hunting on cougar populations,

especially high levels designed to suppress populations, can be varied and is not well understood."

66.    Despite not knowing how the Upper Arkansas River Plan will negatively impact cougar populations, CPW proposes a nine-year duration for the Plan and intends to rapidly reduce the cougar population in two separate DAUs by 50 percent during that time.

67.    According to CPW, in stage one (years 1-3), the cougar population in D-16 will be reduced by an estimated 50 percent; in stage two (years 4-6), CPW will reduce killing, allowing cougar populations to partially recover; in stage 3 (years 7-9), CPW will reduce the cougar population in D-34 by an estimated 50 percent.

68.    The estimated total cost for the Upper Arkansas River Plan is $3,931,800 over the total nine-year period, or an average cost of $435,000 per year.  FWS has agreed to federally fund 75 percent of the project—or $2,948,850—through the use of grants under the Pittman-Robertson Wildlife Restoration Act (16 U.S.C. §§ 669-669k).

69.    FWS will periodically review and reimburse CPW's expenditures for the Upper Arkansas River Plan.

**FWS's Adoption of the 2017 Wildlife Services' EA**

70.    Wildlife Services is a federal program within the U.S. Department of Agriculture that conducts "predator damage management" in Colorado and throughout the country, responding to a variety of requests related to a variety of species.

71.    In 2005, Wildlife Services prepared a statewide EA ("2005 Wildlife Services' EA") for Wildlife Services' general predator damage management activities in Colorado.

Wildlife Services subsequently finalized its new statewide EA—the 2017 Wildlife Services' EA—to replace the 2005 Wildlife Services' EA.

72.     The 2017 Wildlife Services' EA generally discusses and purports to analyze the environmental impact of Wildlife Service's predator damage management activities statewide. These statewide activities include both lethal and nonlethal control actions targeting a wide range of predators, including coyotes, cougars, black bears, bobcats, raccoons, skunks, opossums, red fox, swift fox, feral dogs, feral cats, badger, crows, ravens, magpies, and several other migratory birds.

73.     Wildlife Services prepared its 2017 EA in cooperation with the Colorado Department of Agriculture, CPW, the Bureau of Land Management, and the U.S. Forest Service. FWS was not a cooperating agency.

74.     In the 2017 Wildlife Services' EA, Wildlife Services briefly summarized the Plans by copying language verbatim from CPW's plan proposals and by attaching those same proposals as appendices.

75.     In January 2017, Wildlife Services issued a FONSI for its 2017 EA.  In the FONSI, Wildlife Services concluded that its predator damage management activities statewide do not constitute a major federal action significantly affecting the quality of the human environment, and therefore declared that it would not prepare an EIS.

76.     On February 27, 2017, FWS issued its own FONSI adopting in part the 2017 Wildlife Services' EA, as it relates to the Piceance Basin and Upper Arkansas River Plans.

77.     FWS did not circulate any draft or final EA and did not re-circulate the 2017 Wildlife Services' EA for public review before issuing its FONSI.

78.     FWS also did not circulate its FONSI for public comment and review.

**Substantial Changes Between the 2017 Wildlife Services' EA and FWS's FONSI**

79.     FWS summarized CPW's proposals in its FONSI, identifying numerous changes made to the proposals since the preparation of the 2017 Wildlife Service's EA and Wildlife Services' FONSI.

80.     For example, FWS now proposes that a total of 5-15 cougars and 10-25 black bears would be killed annually in connection with the Piceance Basin Plan, an increase from the original estimates of 5-10 cougars and 10-20 black bears annually.

81.     FWS's FONSI, for the first time, released information on the *percentages* of the black bear and cougar populations that CPW will remove, as the 2017 Wildlife Services' EA contained no population estimates for black bears or cougars in the Piceance Basin Plan area.

82.     FWS's FONSI also provides changes and new information related to the Upper Arkansas River Plan.  For example, CPW originally asserted—and the 2017 Wildlife Services' EA reflects—that it would remove 50 percent of the cougar population in D-16 of the Upper Arkansas River Plan area over the first one to three years.  FWS's FONSI, however, now indicates that CPW will aim to kill 50 percent of the population *all in the first year* of the Plan alone, and then will maintain a suppressed population for the following two years using hunters, contract hunters, or Wildlife Services to kill approximately 10-20 additional cougars per year.

83.     Similarly, CPW originally asserted that it would kill 50 percent of the cougar population in D-34 over the seventh, eighth, and ninth years of the Upper Arkansas River Plan.  FWS's FONSI, however, indicates that CPW will aim to lethally remove 50 percent of the population *all in year seven*, and then it will maintain a suppressed population for the following

two years using recreation hunters, contract hunters, or Wildlife Services to kill approximately 15-30 additional cougars per year.

84.     The new population data, an increase in the number of bears and cougars targeted for lethal removal in the Piceance Basin Plan area, and a drastic change in the timing and rate of killing in the Plan areas, are substantial changes to the Plans not reflected in the 2017 Wildlife Services' EA.

### Inadequacies of the 2017 Wildlife Services' EA and FWS's FONSI

85.     The 2017 Wildlife Services' EA does not provide population estimates for black bears or cougars in the Piceance Basin Plan area. Petitioners repeatedly asked CPW for these estimates with no response. Absent this critical information, the EA did not consider, and the public was unable to comment on, what percentage of black bears and cougars will be lethally removed from the Piceance Basin Plan area and how this level of killing will impact the population or the local ecosystem.

86.     FWS's FONSI states, for the first time, that the lethal removal of 25 black bears in the Piceance Basin Plan area will result in "a cumulative take of 6.3 percent," but does not indicate what geographic area was used to calculate this percentage, nor what the population of black bears is in the Piceance Basin.

87.     Similarly, FWS's FONSI states, for the first time, that the lethal removal of 15 cougars from the Piceance Basin Plan area will result in an "estimated harvest rate" of 9.2 percent, but does not indicate what geographic area was used to calculate this percentage, nor what the population of cougars is in Piceance Basin.

88.     The 2017 Wildlife Services' EA and FWS's FONSI fail to provide information as to how the black bear and cougar population estimates in the Upper Arkansas River Plan area were calculated.

89.     The 2017 Wildlife Services' EA and FWS's FONSI assert that the success of a project aimed at removing predators to boost mule deer populations is dependent upon the habitat carrying capacity, or the availability of resources on the landscape, such as forage, to support the population objectives.  But the 2017 Wildlife Services' EA and FWS's FONSI fail to provide information, data, or studies analyzing or estimating the habitat carrying capacity for mule deer in the Piceance Basin or the Upper Arkansas River Plan areas.

90.     The 2017 Wildlife Services' EA is internally inconsistent and contradictory regarding the number and percentage of cougars that will be killed in the Upper Arkansas River Plan area.  The Plans, EA, and FWS's FONSI indicate that CPW has a goal to remove 50 percent of the cougar population from D-16 and 50 percent from D-34 in the Upper Arkansas River Plan area.  The 2017 Wildlife Services' EA, however, when addressing the impacts to cougar populations, states, "[i]ncreased localized mountain lion harvest may be conducted to protect mule deer in Colorado at rates up to 36 percent of the local mountain lion population," citing a personal communication with CPW employee Chuck Anderson.  This information is confusing to the public and is misleading to commenters and potential commenters, who may mistakenly believe that CPW plans to remove 36 percent, rather than 50 percent, of the local cougar population.

91.     The 2017 Wildlife Services' EA includes four alternatives as to how Wildlife Services will conduct its statewide predator damage management in Colorado.  Of those

alternatives, Alternative 1 continues business as usual, and Wildlife Services would be available to kill cougars and black bears in the Piceance Basin Plan Area and cougars in the Upper Arkansas River Plan area.  Alternatives 2, 3, and 4 would all terminate Wildlife Services' ability to take part in the lethal removal of cougars and black bears in the Piceance Basin Plan and cougars in the Upper Arkansas River Plan.  FWS's FONSI notes that only Alternative 1 involves federal funding for the Plans, while the Plans could not occur at all under Alternatives 2, 3, or 4 of the 2017 Wildlife Services' EA.  FWS does not analyze any other alternatives in its FONSI, including no alternatives to its own action, such as providing funding at any rate other than the 75 percent maximum rate under the Pittman-Robertson Wildlife Restoration Act.

92.      The 2017 Wildlife Services' EA and FWS's FONSI fail to consider important relevant science, including studies that have found that sport hunting may have negative impacts on local populations of hunted species.  In fact, in response to comments on the draft EA, Wildlife Services completely dismissed such studies, stating that they were not relevant because Wildlife Services "very rarely conducts lethal removal of mountain lions" and predator culling experiments "specifically contemplate short term reductions with impacts lasting less than one year."  Yet in the Upper Arkansas River Plan area, the Plan specifically proposes increasing sport hunting in the area in addition to utilizing Wildlife Services and other contract killers, with the goals of reducing the local cougar population by 50 percent and keeping the cougar population suppressed for multiple years.  Similarly, the Piceance Basin Plan relies exclusively on Wildlife Services to kill large numbers of cougars in a sustained manner for its duration, with the goal of suppressing the population for multiple years.  FWS's FONSI fails to provide

additional analysis to respond to these relevant studies on the impact of sport hunting, and the

studies therefore go unaddressed despite being relevant to the Plans.

93.     Neither the 2017 Wildlife Services' EA nor FWS's FONSI discuss the impacts of

how the targeted killing of cougars and black bears will interact with other causes of mortality

for these species.

## FIRST CAUSE OF ACTION
## Violation of NEPA and the APA
## (Failure to Prepare a NEPA Analysis)

94.     Petitioners hereby incorporate all preceding paragraphs.

95.     NEPA requires federal agencies to prepare an EIS for all "major Federal actions

significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C); 40

C.F.R. § 1502.3.  An agency may first prepare an EA to determine whether to prepare an EIS or

instead to issue a FONSI.  40 C.F.R. §§ 1501.4(b), 1508.9.

96.     Federal action includes "projects and programs entirely or partly financed . . . by

federal agencies."  *Id.* § 1508.18(a); *see also id.* § 1508.18(b)(4) ("Projects [defined as "Federal

actions"] include actions approved by permit or other regulatory decision as well as federal and

federally assisted activities.").

97.     FWS's decision to finance 75 percent of the Piceance Basin and Upper Arkansas

River Plans is a major federal action under NEPA, requiring the preparation of an EA or EIS.

98.     FWS did not prepare an EA or EIS for the Plans, but rather issued a FONSI

purporting to adopt the 2017 Wildlife Services' EA.

99.     NEPA's implementing regulations do permit an agency to adopt an EIS or EA

issued by another agency in certain situations.  First, if an agency participated in the preparation

of an EIS or EA as a cooperating agency, it may adopt that final document after it has

independently reviewed the analysis and determined that it satisfied its own NEPA procedures.

*Id.* § 1506.3(c); *see also* CEQ, Guidance Regarding NEPA Regulations, 48 Fed. Reg. 34,263,

34,265 (July 28, 1983).  FWS was not a cooperating agency in the preparation of the 2017

Wildlife Services' EA.

100.    Second, a federal agency which was not a cooperating agency because the agency

did not anticipate that it would be involved in a project which was the subject of another

agency's EIS or EA may nevertheless adopt the NEPA document if the proposed action is

substantially the same as the action described in the document.  40 C.F.R. § 1506.3(b); *see also*

48 Fed. Reg. at 34,265.  In this instance, the adopting agency must not only independently

review the NEPA document to determine that it is current and that its own NEPA procedures

have been satisfied, but the agency also must recirculate the EIS or EA.  40 C.F.R. § 1506.3(b);

48 Fed. Reg. at 34,265. FWS did not undertake an independent review of the 2017 Wildlife

Services' EA and did not recirculate the EA for public comment and review.

101.    Third, if the proposed action is not substantially the same as that covered by

another agency's EIS or EA, the agency may adopt the document by circulating it as a draft or as

a portion of the agency's draft and then prepare a final EIS or EA.  40 C.F.R. § 1506.3(a); 48

Fed. Reg. at 34,265.  FWS did not recirculate the 2017 Wildlife Services' EA in draft or final

form for public review.

102.    CEQ also encouraged agencies to put in place additional mechanisms for adopting

EAs prepared by other agencies.  48 Fed. Reg. at 34,265-66.  Under such procedures, the

adopting agency would independently evaluate the information contained in the EA, take full

responsibility for its scope and content, and publish a FONSI for 30 days of public review before making a final determination as to whether to prepare an EIS. *Id.* at 34,266.

103.    FWS adopted its own procedures for adopting another agency's EA or EIS. According to FWS, when adopting another agency's EA or EIS, FWS must: (1) ensure the document to be adopted adequately complies with Interior/FWS's NEPA procedures and guidance; (2) be a cooperating agency with the other Federal agencies in the preparation of the EA/EIS, in accordance with 40 C.F.R. § 1501.6; (3) ensure the EA/EIS adequately addresses FWS's actions and alternatives being considered; and (4) ensure the EA/EIS meets the NEPA standards prescribed in 40 C.F.R. § 1506.3.  550 FW 2.6B.

104.    Furthermore, where FWS adopts an EA from another federal agency and was not a cooperating agency, FWS must re-circulate the Final EA for public review.  550 FW 2, Exhibit 8.

105.    FWS failed to recirculate the 2017 Wildlife Services' EA, either in draft or final form, before or in connection with issuance of FWS's FONSI.

106.    FWS also failed to circulate its FONSI for 30 days for public review after issuing the FONSI.

107.    Even if FWS complied with NEPA's process for adopting the 2017 Wildlife Services' EA, as described further below, the EA does not comply with NEPA and thus FWS failed to ensure that the 2017 Wildlife Services' EA complies with NEPA.

108.    FWS's failure to issue its own EA or EIS analyzing the impacts of the Piceance Basin and Upper Arkansas River Plans, and failure to properly adopt another agency's NEPA-compliant EA or EIS, violate NEPA and is "arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law" and constitutes "agency action unlawfully withheld or

unreasonably delayed."  5 U.S.C. §§ 706(1), (2)(A).

## SECOND CAUSE OF ACTION
### Violation of NEPA and the APA
### (Failure to Adequately Analyze Impacts)

109.    Petitioners hereby incorporate all preceding paragraphs.

110.    NEPA requires that agencies consider the direct, indirect, and cumulative impacts

of their proposed actions.  40 C.F.R. §§ 1502.16, 1508.7, 1508.8.  Agencies must also use

information "of high quality," "insure the professional integrity, including scientific integrity," of

their discussions and analyses, and identify "methodologies used" and "scientific and other

sources relied upon" for their conclusions, because "[a]ccurate scientific analysis, expert agency

comments, and public scrutiny are essential to implementing NEPA."  *Id.* §§ 1500.1(b), 1502.24.

111.    To the extent FWS adopted the 2017 Wildlife Services' EA, it also adopted the

failures of the EA as those failures relate to the Plans.  *See* 48 Fed. Reg. at 34,266 (in adopting

another agency's EA, FWS "must . . . take full responsibility for its scope and content.").

112.    The 2017 Wildlife Services' EA and FWS's FONSI do not adequately analyze the

potential direct, indirect, or short-term, long-term, local, and cumulative impacts to black bears

and cougars in the Piceance Basin Plan area.  For example, these documents do not provide an

estimate of the cougar or black bear population in the Piceance Basin, or more specifically, in the

Roan Plateau area targeted by CPW for predator removals.  Without this baseline information, it

is impossible for FWS or the public to assess the impact of the removal of between 15-45

cougars and between 30-75 black bears over the course of three years.  Because there is no local

population estimate for these species provided anywhere in the environmental analysis, it is

impossible to determine the significance of these lethal removals to the cougar and black bear populations, whether such removals could even lead to local extirpation of cougars and black bears from the Piceance Basin Plan area, and other environmental consequences to the local ecosystem.

113.    Although FWS's FONSI, for the first time, states that the killing of 25 black bears annually result in a "cumulative take of 6.3%" and the killing of 15 cougars annually results in an "estimate harvest rate of 9.2%," FWS does not indicate what geographic area they are using to determine those percentages.  Not only does this demonstrate a lack of necessary analysis, but the public has not had a chance to evaluate the accuracy of these figures or to comment on the impacts of the alleged lethal removal percentage rates.

114.    The 2017 Wildlife Services' EA and FWS's FONSI do not adequately analyze the potential direct, indirect, and cumulative impacts to cougars in the Upper Arkansas River Plan area as a result of removing 50 percent of the cougar population in a single year in two different DAUs.  In one year, CPW is planning to remove approximately 61 cougars from D-16 and anticipates killing between 10-20 cougars over each of the following two years.  Taken together, this means CPW anticipates the removal of up to 101 cougars in D-16 over the course of three years in a population it estimates as including only 123 individuals.  Similarly, CPW is planning to kill 73 cougars in a single year—during year 7—from D-34, and an additional 15-30 cougars over each of the following two years.  Taken together, this means CPW anticipates removal of up to 133 cougars from D-34 over the course of three years in a population that it estimates as including only 147 individuals.  The 2017 Wildlife Services' EA incorrectly states that only 36

percent of the local cougar population will be removed under the Plans, thus failing to adequately analyze the cumulative impact of the Plans and misleading the public.

115.    The 2017 Wildlife Services' EA and FWS's FONSI provides numbers for the "potential population" of cougars in D-16 and D-34 in connection with the Upper Arkansas River Plan, but the agencies do not explain how these estimates were calculated.  FWS must explain the methodology used to determine these population estimates so the public has an opportunity to assess the accuracy of the estimates and any potential drawbacks to the methodology employed.

116.    The 2017 Wildlife Services' EA and FWS's FONSI fail to estimate reasonably foreseeable impacts, such as the death of kittens as a result of mothers being killed, leading to a population impact that is more than the targeted direct removal.

117.    The 2017 Wildlife Services' EA and FWS's FONSI fail to consider studies that have found that sport hunting may have negative impacts on local populations and improperly declines to analyze these studies despite CPW's plans to increase sport hunting of cougars in the Upper Arkansas River Plan area.

118.    Even if FWS properly adopted the 2017 Wildlife Services' EA, FWS fails to adequately analyze the direct, indirect, and cumulative impacts of its actions, fails to provide adequate baseline information so that the public can make an informed decision as to the impacts of its actions, fails to ensure scientific integrity, fails to identify methodologies employed, and fails to allow for public scrutiny.  FWS's failures violate NEPA and are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

**THIRD CAUSE OF ACTION**
**Violation of NEPA and the APA**
**(Failure to Consider a Reasonable Range of Alternatives)**

119.    Petitioners hereby incorporate all preceding paragraphs.

120.    NEPA requires that agencies "[r]igorously explore and objectively evaluate all reasonable alternatives" and "use the NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment."  40 C.F.R. §§ 1500.2(e), 1502.14(a); see also 42 U.S.C. § 4332(2)(E).  This is vital, as a rigorous review of alternatives is considered "the heart of the environmental impact statement."  *Id.* § 1502.14.  FWS must "use the NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment." *Id.* § 1500.2(e).

121.    The 2017 Wildlife Services' EA analyzed four alternatives, which reflected different approaches for Wildlife Services in its statewide management of predators.  Wildlife Services considered Alternative 1 — its preferred alternative, to continue its current predator damage management program throughout Colorado — to be a "no action" alternative because it would be, for Wildlife Services, business as usual.

122.    In relation to CPW's proposed Plans, however, only Alternative 1 represented an action alternative—Alternatives 2, 3 and 4 are no action alternatives, wherein Wildlife Services would not participate in the Plans.

123.    Furthermore, in FWS's FONSI, FWS notes that *only* Alternative 1 would allow for federal funding.  Therefore, *as to FWS's action*, Alternative 1 is the only action alternative considered.

124.    FWS has a responsibility to consider alternatives to *its own* proposed action.

FWS failed to analyze a single action alternative to its funding at the 75 percent level that

differed in any respect from CPW's exact proposal.  FWS does not even consider the most basic

alternative of choosing *not* to fund the CPW Plans, despite Wildlife Services' decision to

participate.  The alternatives presented in FWS's FONSI (alternatives to *Wildlife Services'*

proposed action) are thus unduly narrow and do not comply with NEPA's mandate to rigorously

explore and objectively evaluate all reasonable alternatives.

125.    FWS's failure to explore and evaluate all reasonable alternatives violates NEPA

and is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5

U.S.C. § 706(2)(A).

**FOURTH CAUSE OF ACTION**
**Violation of NEPA and the APA**
**(Failure to Prepare an EIS)**

126.    Petitioners hereby incorporate all preceding paragraphs.

127.    Under NEPA, FWS is required to prepare an EIS for major federal actions that

may significantly affect the quality of the human environment. 42 U.S.C. § 4332(2)(C); 40

C.F.R. §§ 1502.4, 1508.3 ("*Affecting* means will or may have an effect on").

128.    "Significant" includes consideration of both short-term and long-term impacts,

including local impacts, cumulative impacts, whether the action is highly controversial, whether

it may have uncertain or unknown risks, and whether the action threatens a violation of law.  40

C.F.R. §§ 1508.27(a), (b)(4), (b)(5), (b)(7), (b)(10).

129.    FWS's agreement to fund 75 percent of CPW's Plans, totaling over $3.4 million

in federal funds, is a major federal action.  40 C.F.R. § 1508.18(a).

130.    CPW, with funding from FWS, intends to artificially inflate mule deer populations in the Piceance Basin and in the Upper Arkansas River Plan areas by depressing populations of their natural predators, namely black bears and cougars.

131.    Numerous prominent scientists have noted that the Plans are "not based on science" and run counter to scientific publications, some co-authored by CPW and based on research conducted in Colorado, finding that lethal removal of predators does not increase mule deer populations.  These scientists also noted that "CPW's own research clearly indicates that the most likely limiting factors for mule deer are food limitation, habitat loss, and human-induced disturbance—not predators."  Other scientists also found that the Plans' designs raised "legal and ethical concerns," and as a result, "will offer no valid conclusions and misuse already limited funds."

132.    Over the objections of scientists, CPW decided to move forward with the Plans, which are likely to have significant negative localized impacts on cougar and black bear populations.

133.    The Plans may also negatively impact mule deer.  For example, cougars help control chronic wasting disease, a fatal disease that negatively impacts mule deer in Colorado. Removal of cougars could thus inflate the impacts of the disease on mule deer.  Moreover, the removal of native predators could artificially balloon the mule deer population, leading to overbrowsing and causing long-term habitat decline for deer.

134.    In the NEPA context, a project is considered "highly controversial" if there is a "substantial dispute as to the size, nature, or effect of the action." *Middle Rio Grande Conservancy Dist. v. Norton,* 294 F.3d 1220, 1229 (10th Cir. 2002) (citation omitted).  In this

instance, similar studies have been conducted and have demonstrated that lethal removal of

predator populations is an ineffective means to boost ungulate populations.  These studies

represent a substantial dispute as to the effectiveness of the Plans.

135.    The Plans also involve highly uncertain and unknown risks.  Indeed, the agencies

openly admit that the impacts on mule deer as a result of these experiments are unknown, and the

impact to cougar and bear populations and demographics as a result of these lethal removals is

unknown.  The 2017 Wildlife Services' EA states, for example, that "[t]he impact of cougar

hunting on cougar populations, especially high levels designed to suppress populations, can be

varied and not well understood."  Thus, extensive lethal removal in such a short time frame may

have long-term and unintended consequences, and the agencies admit they are unable to predict

the risks associated with these Plans.

136.    The Plans also are likely to have a significant cumulative impact on cougar

populations because the impact may be more than the stated amount of 50 percent when

combined with other causes of mortality, including sport hunting, the deaths of kittens whose

mothers are killed, and lethal removal by CPW or Wildlife Services due to additional damage

control requests (e.g., livestock depredation-related requests).  The 2017 Wildlife Services' EA's

conclusion that such cumulative impacts will not be significant relies at least in part on faulty

data, including an apparent erroneous assertion from CPW that only 36 percent of the local

cougar population in the Upper Arkansas River Plan area will be killed.

137.    FWS relied on the 2017 Wildlife Services' EA as it relates to the Plans, and

adopted shortcoming of that document as they relate to the Plans, including Wildlife Services'

failure to prepare an EIS.  FWS's reliance on Wildlife Service's decision not to prepare an EIS,

and FWS's own failure to prepare an EIS, violate NEPA and are "arbitrary, capricious, an abuse

of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

### FIFTH CAUSE OF ACTION
### Violation of NEPA and the APA
### (Failure to Prepare a Supplemental Environmental Analysis)

138.    Petitioners hereby incorporate all preceding paragraphs.

139.    An agency must supplement its NEPA analysis if "[t]he agency makes substantial

changes in the proposed action that are relevant to environmental concerns."  40 C.F.R. §

1502.9(c)(1)(i).

140.    After the 2017 Wildlife Services' EA was finalized, FWS's FONSI indicated

substantial changes made to the Plans for which the public never had a chance to provide

comments.  For example, the number of cougars and bears targeted for removal in the Piceance

Basin Plan area increased.

141.    Additionally, the 2017 Wildlife Services' EA failed to provide population

estimates for black bears or cougars in the Piceance Basin Plan area.  While FWS's FONSI also

does not include critical population estimates for black bears or cougars, for the first time FWS's

FONSI claims that the killing of black bears will result in the cumulative take of 6.3 percent, and

the killing of cougars will result in the cumulative take of 9.2 percent.

142.    FWS's FONSI revealed for the first time that rather than kill 50 percent of the

cougar population in D-16 in years 1-3 under the Upper Arkansas River Plan, as was originally

asserted under the 2017 Wildlife Services' EA, CPW now plans to kill 50 percent of the cougar

population all in the first year of the Plan, then will maintain a suppressed population the

following two years by killing additional cougars.

143.    Similarly, FWS's FONSI revealed for the first time that rather than kill 50 percent of the cougar population in D-34 in years 7-9 under the Upper Arkansas River Plan, as was originally asserted under the 2017 Wildlife Services' EA, CPW now plans to kill 50 percent of the cougar population all in year seven of the Plan, then will maintain a suppressed population the following two years by killing additional cougars.

144.    The additional removals of black bears and cougars and the increased rate in the killing of these species, taken separately and together, reflect substantial changes in the proposed action that are relevant to environmental concerns.

145.    FWS never provided an opportunity for the public to comment upon these substantial changes.

146.    Because of these substantial changes in the proposed action, FWS is required to prepare a supplemental environmental analysis.  FWS's failure to prepare a supplemental environmental analysis violates NEPA and is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and constitutes "agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. §§ 706(1), (2)(A).

## REQUEST FOR RELIEF

WHEREFORE, Petitioners respectfully request this Court:

A.  Declare FWS violated NEPA and the APA by failing to prepare a NEPA analysis;

B.  Declare FWS violated NEPA and the APA by failing to adequately analyze impacts, ensure scientific integrity, and allow for public scrutiny;

C.  Declare FWS violated NEPA and the APA by failing to consider a reasonable range of alternatives;

D.  Declare FWS violated NEPA and the APA by failing to prepare an EIS;

E.  Declare FWS violated NEPA and the APA by failing to conduct a supplemental environmental analysis in light of substantial changes;

F.  Vacate FWS's FONSI and remand this matter to FWS for further proceedings consistent with this Court's order;

G.  Enjoin FWS from expending additional funds until it has complied with NEPA;

H.  Award Petitioners their reasonable attorneys' fees, costs and expenses of litigation; and

I.  Issue any other relief that this Court deems necessary, just, or proper or relief that Petitioners may subsequently request.

Respectfully submitted this 8th day of March, 2018.

*/s/ Andrea Santarsiere*
Andrea L. Santarsiere (CO Bar # 38089)
Center for Biological Diversity
P.O. Box 469
Victor, ID  83455
Phone: (303) 854-7748
Email: asantarsiere@biologicaldiversity.org

*/s/ Stuart Wilcox*
Stuart Wilcox (CO Bar # 44972)
WildEarth Guardians
2590 Walnut Street
Denver, CO  80205
Phone: (720) 331-0385
Email: swilcox@wildearthguardians.org

*Attorneys for Petitioners*