# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-00558-WYD

CENTER FOR BIOLOGICAL DIVERSITY, a non-profit organization,
THE HUMANE SOCIETY OF THE UNITED STATES, a non-profit organization, and
WILDEARTH GUARDIANS, a non-profit organization,

      Petitioners,

v.

NOREEN WALSH, in her official capacity as Regional Director of the
Mountain-Prairie Region of the U.S. Fish and Wildlife Service,
RYAN ZINKE, in his official capacity as the Secretary of the U.S. Department
of the Interior,
JIM KURTH, in his official capacity as the Acting Director of the U.S. Fish and
Wildlife Service,
THE U.S. FISH AND WILDLIFE SERVICE, a federal agency, and
THE U.S. DEPARTMENT OF THE INTERIOR,

      Respondents.

---

## RESPONSE TO PETITION

---

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... 3

BACKGROUND ............................................................................................................... 6

    A. The Wildlife Restoration Act provides funding for state research. ................................... 6

    B. Colorado requested funding for research relating to declining deer populations. .............. 6

    C. The National Environmental Policy Act................................................................................. 8

    D. FWS coordinated with Wildlife Services on the environmental review............................... 8

    E. FWS reviewed and adopted Wildlife Services' Environmental Assessment. ..................... 9

APA STANDARD APPLIED TO NEPA DETERMINATIONS ................................................. 10

ARGUMENT ....................................................................................................................... 10

I.   FWS properly adopted portions of the Wildlife Services Environment Assessment............ 11

    A. FWS independently reviewed the Environmental Assessment. ........................................ 12

    B. FWS found that the Environmental Assessment satisfied NEPA requirements................ 12

        1. The EA complied with DOI and CEQ's regulations. ................................................... 13

        2. The EA satisfied Wildlife and Sports Fish Restoration Program requirements. .......... 17

        3. The comment period for the EA exceeded public involvement requirements.............. 18

            a. FWS was not required to circulate the EA............................................................. 18

            b. There was public involvement at the EA stage......................................................... 20

    C. Petitioners' other challenges to FWS's adoption of the EA are meritless. ....................... 22

        1. Petitioners rely on regulations that apply only to the adoption of an EIS. ................... 22

        2. Bear and mountain lion populations in the Piceance were publicized.......................... 24

        3. The EA discussed potential for harm to ecosystems
           and of "trophic cascades" and found no risk of either................................................. 26

II.  The FONSI met all of NEPA's requirements.......................................................................... 27

III. FWS was not required to publish the FONSI for comment. .................................................. 28

IV. FWS acted in good faith......................................................................................................... 30

    A. The FONSI was not "predetermined."................................................................................ 30

    B. FWS did not "rush" to adopt the EA without public comment. ....................................... 31

    C. The EA shows objectivity and good faith............................................................................ 32

CONCLUSION...................................................................................................................... 33

# TABLE OF AUTHORITIES

**Cases**

*Auer* v. *Robbins*,
     519 U.S. 452 (1997)……………………………………………………………… 23

*Biodiversity Conservation All.* v. *Jiron*,
     762 F.3d 1036 (10th Cir. 2014) …………………………………………………….. 16

*Christensen* v. *Harris County*,
     529 U.S. 576 (2000) …………………………………………………………….... 19

*Colorado Wild* v. *U.S. Forest Serv.*,
     435 F.3d 1204 (10th Cir. 2006)……………………………………………….... 24

*Forest Guardians* v. *U.S. Fish & Wildlife Serv.*,
     611 F.3d 692 (10th Cir. 2010)……………………………………………….... 10, 30

*Greater Yellowstone Coal.* v. *Flowers*,
     359 F.3d 1257 (10th Cir. 2004)……………………………………………….... 18

*Hillsdale Envtl. Loss Prevention, Inc.* v. *U.S. Army Corps of Eng'rs*,
     702 F.3d 1156 (10th Cir. 2012)…………………………………………… 20, 27, 28

*McGrail & Rowley* v. *Babbitt*,
     986 F. Supp. 1386 (S.D. Fla. 1997) ………………………………………………. 19

*McGrail & Rowley* v. *Babbitt*,
     226 F.3d 646 (table) (11th Cir. 2000) ………………………………………….. 19

*Mich. Gambling Opposition* v. *Kempthorne*,
     525 F.3d 23 (D.C. Cir. 2008)………………………………………………… 29

*Nat'l Parks Conservation Ass'n* v. *Semonite*,
     311 F. Supp. 3d 350 (D.D.C. 2018)……………………………………………….. 29

*New Mexico ex rel. Richardson* v. *BLM*,
     565 F.3d 683 (10th Cir. 2009)…………………………………………16-17, 21 n3, 25 n5

*Sierra Club* v. *U.S. Fish & Wildlife Serv.*,
     235 F. Supp. 2d 1109 (D. Or. 2002)……………………………………………… 26

*Utah Envtl. Cong.* v. *Troyer*,
     479 F.3d 1269 (10th Cir. 2007)……………………………………………….... 24

*Vermont Yankee Nuclear Power Corp.* v. *Nat. Res. Def. Council*,
   435 U.S. 519 (1978) …………………………………………………………... 17

*WildEarth Guardians* v. *Jewell*,
   16-cv-00605-RJ, 2017 WL 3442922 (D.N.M. Feb. 16, 2017)…………….. 18, 19, 20, 21

*WildEarth Guardians* v. *U.S. Fish & Wildlife Serv.*,
   784 F.3d 677 (10th Cir. 2015)………………………………………….. 10, 16, 18, 22, 24

*Winter* v. *Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008)………………………………………………………………... 8

*Western Watersheds Project* v. *BLM*,
   721 F.3d 1264 (10th Cir. 2013)…………………………………………… 10, 16, 22

*Wyoming* v. *USDA*,
   661 F.3d 1209 (10th Cir. 2011) …………………………………………………... 17

**Statutes**

5 U.S.C. § 706………………………………………………………………… 20

16 U.S.C. § 669………………………………………………………………… 6

16 U.S.C. § 669a……………………………………………………………....... 6

16 U.S.C. § 669c……………………………………………………………… 17

42 U.S.C. § 4321……………………………………………………………….. 6

**Regulations**

40 C.F.R. § 1500.1……………………………………………………………. 8, 32

40 C.F.R. § 1500.4…………………………………………………… 8, 10, 11, 23, 31

40 C.F.R. § 1500.5…………………………………………………….. 8, 10, 11, 31

40 C.F.R. § 1501.4………………………………………………… 19, 23 n4, 28-29

40 C.F.R. § 1502.14…………………………………………………………... 16-17

40 C.F.R. § 1506.3………………………………………………………. 22, 23, 24

40 C.F.R. § 1507.3………………………………………………………….. 29

40 C.F.R. § 1508.9……………………………………………………………….. 13

40 C.F.R. § 1508.10……………………………………………………………… 23

40 C.F.R. § 1508.27……………………………………………………………… 27

43 C.F.R. § 46.30………………………………………………………………... 18

43 C.F.R. § 46.120……………………………………………………………… 10

43 C.F.R. § 46.305…………………………………………………………… 19, 29

43 C.F.R. § 46.310…………………………………………………………… 13, 32

43 C.F.R. § 46.320………………………………………………… 10, 11, 17, 18

50 C.F.R. § 80.82…………………………………………………………….....18

50 C.F.R. § 80.83…………………………………………………………….....17

**Federal Register**

48 Fed. Reg. 34,263 (July 28, 1983)……………………………………………… 23, 24

Petitioners claim that the United States Fish and Wildlife Service ("FWS") acted improperly when it adopted the environmental analyses of Wildlife Services, another federal agency.  But the record shows that FWS's decision to adopt the work of its sister agency was not arbitrary or capricious.  FWS met the requirements of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, *et seq*.

## BACKGROUND

**A.  The Wildlife Restoration Act provides funding for state research.**

Under the Wildlife Restoration Act ("WRA"), the federal government provides funds to State fish and game departments.  *See* 16 U.S.C. §§ 669, *et seq*.  States may use the funds for wildlife-restoration projects, including "research into problems of wildlife management."  *Id.* at § 669a(8).

WRA funds are administered by FWS.  Through the Wildlife and Sports Fish Restoration program, FWS distributes WRA funds to conserve, protect, and enhance wildlife, wildlife habitats, and the hunting opportunities they provide.  *See* AR_3712 (FONSI).

**B.  Colorado requested funding for research relating to declining deer populations.**

The Colorado Division of Parks and Wildlife ("CPW") requested approval from FWS to use WRA funds for two research projects evaluating mule deer response to predator reduction. Mule deer populations have been declining in Colorado.  AR_2553 (EA) at 2578.  To better understand the decline, and to evaluate the effectiveness of potential management options, CPW proposed temporarily reducing predator populations in two localized areas.  EA at 2580-2585.

There are between 17,000 and 20,000 black bears in Colorado, and approximately 4,850 mountain lions in the state.  EA at 2610, 2612.  Under the research projects, CPW would

temporarily reduce the number of black bears and mountain lions in an area of the Piceance

Basin in northwestern Colorado and would temporarily reduce the number of mountain lions in

an area on the Arkansas River near Leadville.  EA at 2797, 2808.

In the Piceance study, each year for three years CPW would remove up to 15 mountain

lions from a population of slightly more than 800 lions, and up to 25 black bears from a

population of approximately 850 bears.  FONSI at 3717; CPW Response to WildEarth

Guardians' 22 Questions, responses 9 and 10.[1]

In the Arkansas River study, CWP would conduct research in a crossover design using

two data analysis units ("DAUs") over a nine-year period.  In years 1-3, cougar populations in

DAU-16 would be suppressed to 50% of the population potential.  Years 4-6 is a recovery stage.

In years 7-9, cougar populations in DAU-34 would be suppressed, while DAU-16 would

continue to increase toward habitat potential.  FONSI at 3714, EA at 2813.  Over the nine-year

study, CPW anticipates removing 104 fewer lions than would be killed by hunters in the same

DAUs over the same time if CPW were not conducting the study.  AR_3320.

These research projects were designed to help CPW so it can make better informed

wildlife management decisions going forward.  The record reflects that CPW and FWS are

approaching the projects objectively and that the studies might lead to *less* predator removal in

the future.  For example, CPW and FWS both noted that if the Piceance study shows that

"neonate predation appears compensatory" – i.e. that predators are killing baby deer that would

---

[1]http://cpw.state.co.us/Documents/Commission/2016/Dec/CPW_Response_to_WildEarth_Guardians_22_Questions.pdf#search=B%2D1%20DAU

have died anyway – "predator damage management should be disregarded as a management option to enhance neonate survival and recruitment."  EA at 2799; FONSI at 3713.

### C.  The National Environmental Policy Act.

NEPA "insure[s] that environmental information is available to public officials and citizens before decisions are made and before actions are taken."  40 C.F.R. § 1500.1(b).  But "NEPA itself does not mandate particular results."  *Winter* v. *Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 23 (2008).

NEPA regulations encourage agencies to reduce paperwork and avoid delay by adopting the environmental work of other federal agencies.  The regulations instruct that "Agencies shall reduce excessive paperwork by … providing that an agency may adopt appropriate environmental documents prepared by another agency" and "shall reduce delay by … providing that an agency may adopt appropriate environmental documents prepared by another agency."  40 C.F.R. §§ 1500.4(n), 1500.5(h).  Those regulations are expressly aimed at "eliminating duplication."  *Id*.

### D.  FWS coordinated with Wildlife Services on the environmental review.

Early in its evaluation of CPW's request for funding, FWS learned that the United States Department of Agriculture's Wildlife Services was also looking at the same CPW projects. AR_0129.  In accordance with NEPA regulations and the Department of the Interior's ("DOI") own regulations,[2] FWS considered whether it could adopt the environmental analyses that Wildlife Services was preparing.

---

[2] FWS is part of DOI.

In October 2016, Wildlife Services released its draft environmental analysis for public comment.  The draft included the CPW plans for both studies, and a discussion of those projects. AR_1733; AR_1735 at 1768-75, 1999-2031.  Petitioners in this case submitted extensive comments challenging both plans.  *See* Doc. 28-1 ¶ 8; Doc. 28-5 at ¶ 33.  Petitioners also expressed their views to CPW.  *See* Doc. 1 at ¶ 12.

In January 2017, Wildlife Services issued its Final Environmental Assessment. AR_2542; AR_2553.  The EA attached both CPW research plans, and discussed how the projects would not have a significant environmental impact, in part because they would result in only short-term, localized predator reduction.  *See* EA at 2797, 2808 (project plans); 2581 ("short-term and focused predator control"); 2676 (localized mountain lion populations "can recover to pre-harvest levels" within 3 years).  Wildlife Services also issued a FONSI, finding that its activities would not significantly affect the environment.  AR_2543.

### E.  FWS reviewed and adopted Wildlife Services' Environmental Assessment.

After conducting an independent review of Wildlife Services' EA, FWS decided to adopt the portions of the EA relating to the CPW projects.  FONSI at 3717-18.  FWS then issued its own FONSI, noting that "the CPW research projects … are localized studies which will only result in the temporary removal of small numbers of predators from the study sites."  FONSI at 3717.  FWS also determined that it was unnecessary to recirculate the EA before issuing the FONSI "[b]ecause the two proposed CPW research projects were both summarized and discussed in the EA and provided in their entirety as appendices, the public comment allowed for review and comment on the proposals" and those "[c]omments were received, and responded to in the EA."  FONSI 3712-13.

## APA STANDARD APPLIED TO NEPA DETERMINATIONS

"An agency's decision to issue a FONSI and not prepare an EIS is a factual determination which implicates agency expertise." *WildEarth Guardians* v. *U.S. Fish & Wildlife Serv.*, 784 F.3d 677, 691 (10th Cir. 2015).  The decision is entitled to substantial deference. *Id.* at 683.

The Court's review "therefore ask[s] whether the agency acted arbitrarily and capriciously in concluding that the proposed action will not have a significant impact on the human environment." *Id.* at 691.  A "presumption of validity attaches to the agency action and the burden of proof rests with the appellants who challenge such action." *Id.*  An agency's decision will be upheld if the agency has put forth a rational connection between the data and its decision, even if the court might have reached a different decision. *See W. Watersheds Project* v. *BLM*, 721 F.3d 1264, 1273 (10th Cir. 2013).

## ARGUMENT

When an agency is evaluating a proposed action under NEPA, it may adopt another agency's Environmental Assessment. *See* 40 C.F.R. §§ 1500.4(n), 1500.5(h).  The Department of Interior's regulations expressly encourage and permit such adoption. 43 C.F.R. §§ 46.120(d), 46.320 (regulations for "[a]dopting environmental assessments prepared by another agency").

"If the EA leads the agency to conclude that the proposed action will not significantly affect the environment, the agency may issue a FONSI and forego the further step of preparing an [Environmental Impact Statement]." *Forest Guardians* v. *U.S. Fish & Wildlife Serv.*, 611 F.3d 692, 712 (10th Cir. 2010) (upholding EA and FONSI).

That is what happened in this case.  FWS and Wildlife Services were both considering the same Colorado research projects.  To reduce paperwork, reduce delay, and eliminate

duplication, the two services coordinated. They decided that Wildlife Services would prepare an EA addressing the CPW projects, and FWS could then evaluate that EA. The EA that Wildlife Services prepared with FWS's and CPW's input was thorough. It was put out for public comment, and Petitioners themselves submitted comments challenging the CPW projects. FWS conducted an independent review of the EA and found that it satisfied NEPA and that the CPW projects would not have a significant impact on the environment. FWS therefore adopted the relevant portions of the EA and issued its own FONSI.

**I.      FWS properly adopted portions of the Wildlife Services Environment Assessment.**

NEPA regulations promulgated by the Council on Environmental Quality ("CEQ") instruct that "Agencies shall reduce excessive paperwork" and "shall reduce delay by … providing that an agency may adopt appropriate environmental documents prepared by another agency." 40 C.F.R. §§ 1500.4(n), 1500.5(h). Those regulations are expressly aimed at "eliminating duplication." *Id*.

Consistent with CEQ's instruction, the Department of the Interior's NEPA regulations provide that FWS:

> may adopt an environmental assessment prepared by another agency … if the Responsible Official:
>
> (1) Independently reviews the environmental assessment; and
>
> (2) Finds that the environmental assessment complies with this subpart and relevant provisions of the CEQ Regulations and with other program requirements.

43 C.F.R. § 46.320(a). The Responsible Official must also "ensure that its bureau's public involvement requirements have been met before it adopts another agency's environmental assessment." *Id*. at § 46.320(d).

Those requirements were met here.  FWS independently reviewed the EA and determined that it "was prepared in compliance with NEPA" and that adequate public review had already been provided in EA process.  FONSI at 3712.

## A.  FWS independently reviewed the Environmental Assessment.

FWS reviewed the relevant sections of the Wildlife Services EA during the drafting process.  On August 12, 2016, FWS received a draft section of the EA discussing the CPW projects.  AR_647-662.  An FWS Wildlife Biologist reviewed the draft and suggested changes.  *See* AR_0722.  On August 31, FWS received a full draft of the EA.  AR_787-945.  Again, the FWS Wildlife Biologist reviewed the draft and provided comments to be incorporated to the plans and EA.  *See* AR_0948; AR_1027-80.  FWS also received a draft of the EA when it was released for public comment on October 20, 2016.  AR_1733-2033.

FWS reviewed the Final Environmental Assessment again after it was issued.  *See* FONSI at 3717-18.  Among other things, FWS independently reviewed the sustainable harvest analysis in the EA, comparing it with CPW data regarding the number of bears and mountain lions to be removed during the CPW projects.  As CPW's research leader explained in a February 23, 2017 email to FWS, "[i]n reference to Table 14 of the EA addressing sustainable cougar harvest," the CPW projects would remain below the sustainable harvest rate for cougars.  AR_3319-21.  Later that same day, CPW's research leader also confirmed that the Piceance study would remain below the sustainable harvest rate for bears.  AR_3323.

## B.  FWS found that the Environmental Assessment satisfied NEPA requirements.

The second requirement of DOI's regulations for adopting another agency's EA was also met.  That requirement is that FWS "finds that the environmental assessment complies with this

subpart [subpart D of DOI's regulations, on 'Environmental Assessments'] and relevant provisions of the CEQ Regulations and with other program requirements."  43 C.F.R. § 46.320(a)(2).

The FWS Regional Director made those findings.  As a result of FWS's independent review of the EA, she "concluded that a reasonable range of alternatives were considered, adequate public review was accomplished, and that the proposed projects were sufficiently analyzed in the USDA WS Predator Damage Management EA to comply with NEPA requirements for the two proposed WSFR funded research projects."  FONSI at 3718. Therefore, "[t]o eliminate duplication of procedures," FWS decided to "adopt in part the USDA-WS Final EA, as it relates to the potential environmental impacts of the proposed Service action of funding the two CPW research projects."  *Id*.

### 1.  The EA complied with DOI and CEQ's regulations.

DOI and CEQ have the same requirements for what must be included in an EA.  The DOI regulations state that an EA "must include brief discussions of:  (1) the proposal; (2) the need for the proposal; (3) the environmental impacts of the proposed action; (4) the environmental impacts of the alternatives considered; and (5) a list of agencies and persons consulted."  43 C.F.R. § 46.310(a).  CEQ sets forth the same requirements in slightly different words and a slightly different order.  CEQ's regulations state that an EA "[s]hall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9(b).

FWS found that the Wildlife Services EA met those requirements.

***The proposal*** –FWS found that the "EA contained both CPW research projects, including extensive discussion and explanation in section 1.3.2.6d; and the research proposals are included in their entirety as Appendix A and Appendix B of the EA." FONSI at 3712.

***The need for the proposal*** – The EA and the FONSI both addressed the need for the CPW proposals.

The EA discussed that in the Piceance Basin, CPW had found that fawns were being born at a normal rate, but that the number of fawns joining the herd was decreasing. EA at 2580-81. Thus, "there is need to discern why fewer fawns may be arriving on winter range in the Piceance Basin" and "wildlife biologists need information to better understand early fawn survival…" EA at 2581.

The EA also discussed that the Arkansas River study would "inform predator harvest/management decisions." EA at 2582. CPW needed this research "to examine how deer demographic parameters may change following cougar suppression," *id.*, and also to help CPW evaluate the effects of hunting on cougar populations. EA 2583-85.

FWS found that the EA discussed the need for the projects. In the FONSI, FWS cited specifically to section 1.3.2.6d of the EA in which the need for the projects was discussed. FONSI at 3712. The FONSI summarized the need, including the "need to discern why fewer fawns are arriving on winter range in the Piceance Basin" and to "examine the mule deer population response to cougar suppression." FONSI at 3713, 3714

***The environmental impacts of the proposed action*** – The CPW plans will not have a significant environmental impact.

There are between 17,000 and 20,000 black bears in Colorado.  EA at 2673.  The CPW

Piceance Basin study will remove just 10 to 25 bears each year for three years.  FONSI at 3717.

At the time of the EA, the study anticipated the removal of between 10 and 20 bears each year.

*See* EA at 2801.  The EA referred to that 10-20 bear version of the study when it concluded that

black bear take "is expected to have a low impact on black bears locally, and no impact on the

statewide black bear population."  EA at 2673.  The FONSI considered the slight increase from

the original estimates and found that it was "still well below the sustainable harvest level…"

FONSI at 3713.

There are approximately 4,850 lions in Colorado.  EA at 2675.  Taking into account the

cumulative impact of its own programs, CPW's projects, and hunters, Wildlife Services

concluded, "we anticipate a moderate impact to mountain lions locally, and potentially a low

impact on the statewide mountain lion population."  EA at 2676.  The EA explained that lion

populations would quickly return to their pre-study levels.  In the areas subject to CPW's

research studies, "recovery to the original population level may take 1-3 years."  EA at 2676.

In reaching its conclusion that lion populations would recover quickly, the EA discussed

other studies showing that "a mountain lion population in Nevada had the recruitment capacity

(reproduction and immigration) to rapidly replace annual losses under 'moderate to heavy

exploitation of 30%–50% removal."  EA at 2675.  Other cited studies found that mountain lion

populations recovered less than three years after a 47% harvest.  EA at 2675.  Still other studies

found rates of increase in mountain lion populations between 21%–28% after the removal of

50% of the lions from a study area.  EA at 2675.  Petitioners contend that Wildlife Services "did

not adequately consider the kill objectives for the Plans," because in one place in the EA,

Wildlife Services referred to local mountain lion harvest of 36%, while the CPW Arkansas River plan referred to a harvest of up to 50%. Doc 28 at 26. But as the discussion of these other recovery studies in the EA shows, FWS and Wildlife Services considered mountain lion population recovery after harvest rates of 50%. EA at 2675-76.

    ***The environmental impacts of the proposed alternatives considered*** – The FONSI addressed what each of the EA's four alternatives would mean for FWS funding of the CPW studies. *See* EA at 2628-2662 (Chapter 3: Alternatives). As stated in the FONSI: "For purposes of the Service's adoption in-part of the USDA-WS EA, the CPW research projects proposed for funding through the WSFR program are considered within Alternative 1." FONSI at 3716. The other three alternatives were considered by FWS as alternatives under which it would not fund the CPW projects. FONSI at 3716, 3717.

    Petitioners argue that FWS was required to also consider different funding levels. Doc. 28 at 30. Contrary to Petitioners' arguments, FWS's consideration of alternatives complied NEPA and the Wildlife Restoration Act.

    *First*, Petitioners contend that FWS's consideration of alternatives does not satisfy the requirements of NEPA regulations at 40 C.F.R. § 1502.14. Doc. 28 at 30. But the Tenth Circuit has repeatedly held that Section 1502.14 does not apply to EAs. *See WildEarth Guardians* v. *U.S. Fish and Wildlife Service*, 784 F.3d 677, 696 (10th Cir. 2015) ("We have explained that § 1502.14 applies only to the EIS preparation process, not to the preparation of EAs…"); *W. Watersheds Project* v. *BLM*, 721 F.3d 1264, 1274 (10th Cir. 2013). Petitioners' reliance on *Biodiversity Conservation Alliance* v. *Jiron*, 762 F.3d 1036, 1083 (10th Cir. 2014), and *New*

*Mexico ex rel. Richardson* v. *BLM*, 565 F.3d 683, 711 (10th Cir. 2009), is unpersuasive for the same reason – those cases involved applying Section 1502.14 to EISs, not to an EA.

*Second*, the Wildlife Restoration Act allocates funds to each state according to a formula determined by the geographic area and the number of paid hunting-license holders in the state. *See* 16 U.S.C. § 669c(b).  It is then up to each state to decide how to allocate those funds among eligible projects.  By regulation, "[t]he Regional Director generally approves any Federal share from 10 to 75 percent as proposed by one of the 50 States…"  50 C.F.R. § 80.83(a).  CPW requested 75% funding for the projects.  *See* AR_2394 at 2396.

In light of the statutory allocation of funds and the regulatory guidance to disburse funds in the amount proposed by the states, FWS was not required to consider other funding levels. *See* 43 C.F.R. § 46.310(b).  Even in the EIS context, an agency is not required to consider every conceivable alternative.  *Vermont Yankee Nuclear Power Corp.* v. *Nat. Res. Def. Council*, 435 U.S. 519, 551 (1978).  The agency has "considerable discretion" to define objectives and "need not provide a detailed study of alternatives that do not accomplish that purpose or objective." *Wyoming* v. *USDA*, 661 F.3d 1209, 1244 (10th Cir. 2011).  Thus, FWS's "conclu[sion] that a reasonable range of alternatives were considered" (FONSI at 3718) was not arbitrary or capricious.

*A list of agencies and persons consulted* – Chapter 6 of the EA listed preparers, persons and agencies consulted.  EA at 2768-69.

## 2. The EA satisfied Wildlife and Sports Fish Restoration Program requirements.

To adopt another agency's EA, DOI's regulations require that FWS must also determine that the EA "complies … with other program requirements."  43 C.F.R. § 46.320(a)(2).  The

program here is the Wildlife and Sport Fish Restoration Program ("WSFR"). FWS's regulations for the WSFR program require that applicants provide information that enables the Service to comply with the applicable requirements of NEPA. 50 C.F.R. § 80.82(c)(13)(ii).

FWS and CPW worked together to review and revise the study plans and to have them incorporated into the EA. *See, e.g.*, AR_948, AR_1596. FWS found that "the proposed projects were sufficiently analyzed in the USDA WS Predator Damage Management EA to comply with NEPA requirements for the two proposed WSFR funded research project." FONSI at 3718. This finding of compliance with NEPA was thus also a finding of compliance with the WSFR program requirements.

### 3. The comment period for the EA exceeded public involvement requirements.

DOI regulations also require that the FWS "must ensure that its bureau's public involvement requirements have been met..." *Id.* at §§ 46.320(d), 46.30 ("bureau" includes "service"). FWS found that "adequate public review was accomplished." FONSI at 3718. *See WildEarth Guardians* v. *Jewell*, 16-cv-00605-RJ, 2017 WL 3442922 at *10-11 (D.N.M. Feb. 16, 2017) (denying petition challenging DOI office's adoption of EA).

#### a. FWS was not required to circulate the EA.

NEPA does not require agencies to circulate Environmental Assessments. *Greater Yellowstone Coal.* v. *Flowers*, 359 F.3d 1257, 1279 (10th Cir. 2004); *accord WildEarth Guardians* 784 F.3d at 699 ("In *Flowers*, the assessment *itself* was never circulated"). Agencies have "significant discretion in determining when public comment is required with respect to EAs." *WildEarth Guardians*, 784 F.3d at 698 (quoting *Taxpayers of Mich. Against Casinos* v. *Norton*, 433 F.3d 852, 861 (D.C. Cir. 2006)).

DOI's regulations provide that "[p]ublication of a 'draft' environmental assessment is not required."  43 C.F.R. § 46.305(b).  All that is required under the DOI regulations is that "the bureau must notify the public of the availability of an environmental assessment and any associated finding of no significant impact once they have been completed."  *Id*. at § 46.305(c).  That was accomplished with the publication of the FONSI, which includes a link to the EA online at the FWS website.  *See* FONSI at 3718; *Jewell*, 2017 WL 3442922 at *11.

FWS's manual does not require circulation of the EA for public comment either.  *First*, the manual is not binding on FWS.  *See McGrail & Rowley* v. *Babbitt*, 986 F. Supp. 1386, 1394 (S.D. Fla. 1997); *aff'd* 226 F.3d 646 (table) (11th Cir. 2000); *Christensen* v. *Harris County*, 529 U.S. 576, 587 (2000) ("agency manuals … lack the force of law").  *Second*, the manual instructs that only "[i]n certain cases," when 40 C.F.R. § 1501.4(e)(2) requires the FONSI to be made available for public review, "[i]f the EA was not previously made available for public review, it should be made available for public review at the same time the FONSI is circulated."  550 FW 3.3(B)(4)(c) (AR_3889 at 3891).  As discussed in Part III, below, the limited circumstances in which a FONSI must be circulated for public comment do not apply here, so the EA did not need to be recirculated for public comment.

Petitioners contend that a draft section of FWS's manual, 550 FW 2, requires FWS to recirculate the final EA before issuing a FONSI if FWS was not a cooperating agency in the preparation of the EA.  Doc. 28 at 21.  But that section of the manual – although cross-referenced by 550 FW 3 – is only a draft.  It has not been adopted by FWS.  *See* AR_3884 at 3886 (Index of FWS Service Manual Chapters showing 550 FW 3, but *not* 550 FW 2).  And although a flow chart attached to 550 FW 2 lists "Recirculate Final EIS/EA" above "prepare/issue ROD/FONSI,"

neither it, nor any other part of 550 FW 2, establishes any time frames for either process.  In light of 550 FW 2 being only a draft, the flow chart should be interpreted in a way that makes it consistent with 550 FW 3 – the only section of part 550 to have actually been adopted into the FWS manual.  The clear instruction in 550 FW 3 is that EAs need not be made available until the FONSI is circulated (and even then only in limited circumstances).

### b.  There was public involvement at the EA stage.

Petitioners are asking the Court to order FWS to re-do its NEPA process, "thereby allowing an opportunity for Petitioners to submit comments on behalf of their members regarding the impacts of FWS's funding of the Plans…"  Doc. 28 at 17.  But Petitioner already had that opportunity and did submit comments regarding the CPW plans.

The APA requires that "due account shall be taken of the rule of prejudicial error." 5 U.S.C. § 706.  Thus, "even if an agency violates the APA, its error does not require reversal unless a plaintiff demonstrates prejudice resulting from the error."  *Hillsdale Envtl. Loss Prev., Inc.* v. *U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1165 (10th Cir. 2012).  "Because Petitioner had notice of the relevant facts and participated in the comment period for the EA adopted … Petitioner has not suffered prejudice as a result of any alleged procedural error."  *Jewell*, 2017 WL 3442922 at *11.

FWS made sure that the public had an opportunity to comment on the CPW plans at the Wildlife Services EA stage.  In September 2016, FWS Wildlife Biologist Judson Spicer wrote to Wildlife Services:

> "Please include the entire study plan in the EA, as we want to ensure the public
> has all the available information to review during the public comment period."

AR_1596.  When Wildlife Services released a draft of the EA for public comment on October

20, 2016, the draft EA included copies of the CPW studies, and a section of EA discussed those

studies.  *See* AR_1730; AR_1735 at 1767-75, 2000-2031.

Petitioners used that opportunity to raise their questions and concerns about the CPW

plans.  *See* FONSI at 3713; Declaration of Wendy Keefover, Human Society of the United States

("HSUS") Native Carnivore Protection Manager, Doc. 28-5 at ¶ 33 ("HSUS submitted

comments, jointly with Center for Biological Diversity"); Declaration of Bethany Cotton,

Wildlife Program Director for WildEarth Guardians, Doc. 28-1 at ¶ 8 ("Guardians submitted

lengthy scientific and legal comments on the draft EA").[3]

CPW also provided an opportunity for public comment on the studies.  CPW hosted

public meetings in September and December of 2016.  Petitioners participated at both meetings.

Doc. 1 at ¶ 12; Doc. 28-1 ¶¶ 6, 9-10; Doc 28-5 at ¶ 29.  WildEarth Guardians submitted 22

questions at the September meeting.  AR_1024, 1026.  Petitioners "submitted technical, legal,

and scientific comments …opposing, the proposed plans."  Doc. 28-1 at ¶ 7.  "HSUS [petitioner

Humane Society of the United States] also submitted comments and testimony directly related to

CPW's predator killing Plans in the Piceance Basin and in the Upper Arkansas River (UAR)

areas."  Doc. 28-5 at ¶ 26; *see Jewell*, 2017 WL 3442922 at *10.

---

[3] HSUS's letter on behalf of itself and the Center for Biological Diversity is available at
https://www.regulations.gov/document?D=APHIS-2016-0082-0010.  HSUS and CBD raised
objections to both CPW plans.  *See* HSUS Nov. 25, 2016 letter at 34-35.  WildEarth's letter is
available at https://www.regulations.gov/document?D=APHIS-2016-0082-0006.  WildEarth also
discussed the plans.  *See* WildEarth Guardians Nov. 23, 2016 letter at 9-10.  The Court can take
judicial notice of these letters as evidence that the Petitioners submitted comments relating to
the CPW plans.  *New Mexico ex rel. Richardson* v. *BLM*, 565 F.3d 683, 702 n.22 (10th Cir. 2009)
(taking judicial notice of information on websites of federal agencies in APA case).

FWS was aware of these comments and took them into consideration.  CPW sent

WildEarth's 22 questions to FWS.  AR_1024.  The FONSI notes:  "Comments were received,

and responded to in the EA, that related to the topics of the research proposals."  FONSI at 3713.

FWS also reviewed the process that Wildlife Services engaged in to solicit public

involvement in the EA.  The FONSI's "Public Involvement" section noted that "[b]ecause the

two proposed CPW research projects were both summarized and discussed in the EA and

provided in their entirety as appendices, the public comment allowed for review and comment on

the proposals."  FONSI at 3712-13.

**C.   Petitioners' other challenges to FWS's adoption of the EA are meritless.**

**1.   Petitioners rely on regulations that apply only to the adoption of an EIS.**

Petitioners base several arguments on the contention that FWS allegedly failed to comply

with 40 C.F.R. § 1506.3.  Petitioners claim that under that provision, FWS could adopt the EA

only if: (i) FWS was not a formal cooperating agency, citing 40 C.F.R. § 1506.3(c); (ii) FWS had

not anticipated that it would be involved in the projects, citing 40 C.F.R. § 1506.3(b) and 48 Fed.

Reg. at 34,265 (discussing EISs); and (iii) FWS recirculated the final NEPA analysis for public

comment, citing 40 C.F.R. § 1506.3(b).  *See* Doc. 28 at 20-21.

The problem with all these arguments is that Section 1506.3 expressly applies only to the

adoption of environmental impact statements, not environmental assessments.  *See* 40 C.F.R.

§ 1506.3(a).  As the Tenth Circuit has repeatedly found, an EIS and an EA are not the same.

*WildEarth Guardians* v. *U.S. Fish & Wildlife Serv.*, 784 F.3d 677, 690-91 (10th Cir. 2015).

Regulations establishing requirements specifically for EISs do not apply to EAs.  *Id*. at 696; *W.*

*Watersheds Project* v. *BLM*, 721 F.3d 1264, 1274 (10th Cir. 2013).

CEQ's NEPA regulations at 40 C.F.R. § 1500.4(n) state that "Agencies shall reduce excessive paperwork by … providing that an agency may adopt appropriate environmental documents prepared by another agency (§ 1506.3)." "Environmental documents" is a defined term. It refers to EAs, EISs, FONSIs, and notices of intent, collectively. *Id*. at § 1508.10. Thus, agencies are instructed by § 1500.4(n) to have procedures for adopting each type of environmental document. But the cross reference to § 1506.3 in the parenthetical is to a section referring only to Environmental Impact Statements. That the same regulations use the general term "environmental documents" in § 1500.4(n) but only the specific term "Environmental Impact Statement" in § 1506.3 reflects that § 1506.3 creates additional requirements applying only when an agency wants to adopt an Environmental Impact Statement.

CEQ's own interpretation of its regulations confirms that § 1506.3 does not apply to the adoption of EAs. *See Auer* v. *Robbins*, 519 U.S. 452, 461 (1997) (An agency's interpretation of its own regulations is "controlling unless plainly erroneous or inconsistent with the regulation."). Discussing § 1506.3 in the Federal Register, CEQ noted that: "The CEQ regulations specifically address the question of adoption only in terms of preparing EIS's." 48 Fed. Reg. at 34,265.

In contrast to the specific requirements CEQ imposes for adopting EISs, when it comes to EAs, the Council merely "encourages agencies to put in place a mechanism for adopting environmental assessments prepared by other agencies" and provides a couple of guiding principles,[4] but leaves it up to agencies to establish their own procedures for adopting an EA. *Id*.

---

[4] Those guiding principles are: *first* that the agency independently evaluate the information and take responsibility for it; and *second* that if the proposed action meets the criteria in § 1501.4(e)(2), a FONSI would be published for public review before a final determination is made. As discussed in Part I.A, the first principle of independent review was met. As discussed in Part III, below, the second principle, § 1501.4(e)(2), does not apply to the FONSI in this case.

at 34,265-66.  Thus, it is each agencies' own regulations that apply when adopting an EA, not CEQ's EIS-specific regulations in Section 1506.3.  As discussed in Part I above, FWS complied with DOI's regulations for adopting an EA.

### 2.  Bear and mountain lion populations in the Piceance were publicized.

Petitioners claim that the "EA does not provide a population estimate for cougars or black bears in the Piceance Basin or, more specifically, in the Roan Plateau area targeted for predator killing," and therefore it is "impossible to ascertain the actual reduction rate under the Piceance Basin Plan," and "impossible for FWS or the public to make a reasoned analysis as to the impacts of the Plan."  Doc. 28 at 23-24.  Petitioners' criticism is unfounded.

*First*, the EA provided population density information for both black bears and mountain lions that can be applied to the Piceance Basin.  *See* EA at 2610, 2612.  The EA explains how these estimates were arrived at through a review of published studies and consultation with CPW.  *See* EA at 2610, 2612.  Wildlife Services and FWS are entitled to "especially strong" deference to their conclusions that the available population studies are scientifically useful.  *Utah Envtl. Cong.* v. *Troyer*, 479 F.3d 1269, 1286 (10th Cir. 2007).  The Tenth Circuit has instructed that "deference to the agency is greatest when reviewing technical matters within its area of expertise, particularly its choice of scientific data and statistical methodology."  *Colorado Wild* v. *U.S. Forest Serv.*, 435 F.3d 1204, 1216 (10th Cir. 2006).  And it is not a clear error of judgment to rely on studies from state agencies.  *See WildEarth*, 784 F.3d at 694 ("There was no NEPA violation with respect to the Service's reliance on the state studies.").

*Second,* CPW told petitioners and the public how many bears and mountain lions live around the study area.  Before the December 14, 2016 public meeting, CPW published responses

to the questions WildEarth Guardians had submitted at the September meeting.  *See supra*, p 21.

CPW explained that "the population of bears in the entire bear management unit involved in the

study has been estimated to be about 850" and that "[w]ith regard to lions, the estimated

population in the management unit involved in the study is slightly more than 800."  CPW

Response to WildEarth Guardians' 22 Questions, response 9.[5]

As explained in the study, the management units (sometimes referred to as Data Analysis

Units or DAUs) "represent[] population level biological units."  EA at 2801.  Within those

populations of about 850 bears and slightly more than 800 lions, the Piceance Basin plan calls

for "focal removal (targeting areas of past predation activity)" of up to 25 bears and 15 lions in a

small "predator treatment" area.  EA at 2801 ("6% of mountain lion DAU L-7 and 16% of black

bear DAU B-1"); FONSI at 3713.  CPW told the public that "[a]pproximating cougar and bear

densities … suggests about 38 independent-age cougars and about 134 black bears occupy the

specific … predator reduction area."  CPW Response 9.

But as explained in the study and the EA, the larger population units "should be

minimally influenced," and will quickly repopulate the small predator treatment area.  EA at

2801.  The EA explains that predator populations recover because "immigration, compensatory

mortality, and births among remaining animals will restore populations to pre-removal levels."

EA at 2760.  Mountain lions in particular will repopulate through immigration from adjacent

areas.  EA at 2676.  As the EA discussed, CPW study areas will recover to the original lion

population within three years.  EA at 2676, *see supra* pp. 15-16.

---

[5] http://cpw.state.co.us/Documents/Commission/2016/Dec/CPW_Response_to_WildEarth_Guard
ians_22_Questions.pdf#search=B%2D1%20DAU.  The Court can take judicial notice of CPW's
responses.  *New Mexico*, 565 F.3d at 702 n.22.

*Finally*, Petitioners' reliance on *Sierra Club* v. *U.S. Fish & Wildlife Serv.*, 235 F. Supp. 2d 1109 (D. Or. 2002), is unpersuasive.  In that case, the court determined that because there was no reliable estimate for the cougar population in at least one study area, "the total mortality rate may exceed the fifty-percent rate which the EA estimates is compatible with a sustainable cougar population." *Id*. at 1135.  The court further found in that case that "the EA's own population and harvest figures show that the greater than fifty-percent rate is not mere speculation, but is a distinct possibility, even a probability." *Id*.

By contrast, in this case CPW estimated that mountain lion population "in the management unit involved in the study is slightly more than 800."  Bear population "in the entire bear management unit involved in the study has been estimated to be about 850." *See supra* p. 25.  Taking 15 lions or 25 bears out of those populations is less than 3 percent.  Unlike *Sierra Club*, the harvest rates in the Piceance study are so far below 50% that any speculation that the CPW study (on its own or cumulatively) might cross the 50% harvest level is unsupported.[6]

### 3. The EA discussed potential for harm to ecosystems and of "trophic cascades." and found no risk of either.

Petitioners claim the EA "fails to discuss the potential local impacts on ecosystem health and trophic cascades."  Doc. 28 at 24.  But those concepts are discussed in Sections 4.1.2.1j and 4.1.2.1k of the EA, which explain that there would be no impact on biodiversity or ecosystem resilience, and no trophic cascade.  EA at 2710-15.  As discussed in the EA, the "number of predators taken annually by WS-Colorado and other entities is a small percentage of the

---

[6] Similarly, CPW estimated the mountain lion population in the two DAUs involved in the Arkansas River project at 123 and 147 lions respectively, based on studies by the Cougar Management Guidelines Working Group.  EA at 2813; AR_3242 at 3251-52.  That population estimate makes the rationale of *Sierra Club* inapplicable to the Arkansas River project.

estimated populations of those species in the state" and "[a]ny reduction of a local population or groups would be temporary because natural immigration from adjacent areas or reproduction from remaining animals would replace the animals removed…"  EA at 2711.

## II.    The FONSI met all of NEPA's requirements.

A FONSI is a finding of no significant impact.  The term "significantly as used in NEPA requires considerations of both context and intensity."  40 C.F.R. § 1508.27.  FWS properly considered both context and intensity.

The FWS FONSI addressed context, finding that the "CPW research projects are not statewide; rather, they are localized studies which will only result in the temporary removal of small numbers of predators from the study sites."  FONSI at 3717.

FWS also considered intensity.  NEPA regulations specify ten factors to be considered in evaluating intensity.  40 C.F.R. § 1508.27(b).  None of those 10 factors is dispositive.  *Hillsdale Envtl. Loss Prevention, Inc.* v. *U.S. Army Corps of Engineers*, 702 F.3d 1156, 1180 (10th Cir. 2012).  Between the EA and the FONSI, FWS considered all relevant factors:

| Factor | Discussion |
|---|---|
| Impacts both beneficial and adverse | "Alternative 1 which would include the proposed CPW research projects … lethal take (intentional and unintentional) by USDA-WS would not be of sufficient magnitude, duration or scope to trigger substantial adverse impacts on trophic cascades, biodiversity or ecosystem stability …. As discussed in detail in Section 4.1.1. of the EA, impacts are generally temporary and in relatively small or isolated geographic areas…" FONSI at 3717; *see also* EA at 2673-74, 2675-77, 2710-15. |
| Public health and safety | "The use of PDM methods by WS-Colorado poses little potential hazard … to the public because all methods and materials are consistently used in a manner known to be safe."  EA at 2718, *see also* EA at 2718-2724 (discussing public safety). |

| | |
|---|---|
| Unique characteristics of geographic area | "None of the WDM methods … cause major ground disturbance; any physical destruction or damage to property; any alteration of property, wildlife habitat, or landscapes…" EA at 2597. |
| Controversy | The FONSI and EA both acknowledged that Petitioners and some others objected to the CPW studies.  FONSI at 3712-13; EA at 2626, 2752-2767.  But "[c]ontroversy in this context does not mean opposition to a project, but rather 'a substantial dispute as to the size, nature or effect of the action.'"  *Hillsdale*, 702 F.3d at 1180.  There is no dispute as to the size or nature of the CPW research projects, and no substantial dispute as to the effect of the projects.  The effect will be only temporary.  *See supra* pp. 14-16; FONSI at 3717. |
| Highly uncertain effects | "As discussed in Section 4.1.1. of the EA, impacts are generally temporary and in relatively small or isolated geographic areas…" FONSI at 3717; *see also* EA at 2673-74, 2675-77, 2710-15. |
| Establishing precedent | Precedent is not a factor here.  FWS was evaluating these studies under the Wildlife Restoration Act, which sets the criteria for funding research projects proposed by state fish and game departments. |
| Cumulatively significant impacts | The EA evaluated direct impacts, indirect impacts, and cumulative impacts on black bears and mountain lions of alternatives that included the CPW research projects.  *See* EA at 2673-74, 2675-77. |
| Historic Places | "[T]he methods that would be used by WS-Colorado under the proposed action do not have the potential to affect historic properties."  EA at 2597. |
| Effect on endangered or threatened species | "[T]he Service fulfilled intra-service requirements for Section 7 of the Endangered Species Act for both CPW research projects." FONSI at 3718. |
| Federal, state and local law for the protection of the environment | Compliance with Federal, state and local laws was discussed in the EA.  *See* EA at 2596-2598. |

III.    **FWS was not required to publish the FONSI for comment.**

NEPA regulations provide only two "limited circumstances" in which a FONSI must be made available for public review before the agency makes its final determination.  Those two circumstances are: "(i) the proposed action is, or is closely similar to, one which normally

requires the preparation of an environmental impact statement under the procedures adopted by the agency pursuant to § 1507.3," or (ii) "the nature of the proposed action is one without precedent."  40 C.F.R. § 1501.4(e)(2).  Neither circumstance applies here.

*First*, funding of the CPW research studies is not an action that normally requires the preparation of an EIS under the procedures adopted by the agency.  In this case, those procedures are the ones published in DOI's Department Manual.  *See Mich. Gambling Opposition* v. *Kempthorne*, 525 F.3d 23, 28-29 (D.C. Cir. 2008) (Department Manual adopted pursuant to § 1507.3).  Funding research projects is not on the DOI's list of activities that normally require an EA or an EIS.  *See* DOI Departmental Manual, 516 DM 8, Managing the NEPA Process— U.S. Fish and Wildlife Service at 8.6, 8.7 (AR_3875 at 3881).

*Second*, the CPW research studies are not unprecedented.  There have been other studies on the impact of predator reduction.  The EA itself cites several such studies.  *See e.g.*, EA at 2576 ("Forrester and Wittmer (2013) reviewed a number of experimental studies on the effects of predator control to manage mule deer populations."); EA at 2580-81 (reviewing multiple studies); EA at 2676 (studies on mountain lion recovery).

Because neither of the two limited circumstances in Section 1501.4(e)(2) apply to FWS's decision to fund the CPW research studies, FWS's decision not to circulate the FONSI was not arbitrary and capricious.  *See* 43 C.F.R § 46.305(c) ("Comments on a [FONSI] do not need to be solicited, except as required by 40 C.F.R. 1501.4(e)(2)."); *Nat'l Parks Conservation Ass'n* v. *Semonite*, 311 F.Supp.3d 350, 374-75 (D.D.C. 2018).

## IV.   FWS acted in good faith.

Petitioners claim that the NEPA process was predetermined, rushed, and lacked integrity. The record shows otherwise.

### A.   The FONSI was not "predetermined."

Petitioners claim that FWS "predetermined" the FONSI.  Doc. 28 at 7.  But the arguments Petitioners put forth fall far short of meeting the Tenth Circuit's "high standard to prove predetermination."  *Forest Guardians* v. *U.S. Fish & Wildlife Serv.*, 611 F.3d 692, 714 (10th Cir. 2010) (petitioners failed to show that FWS predetermined FONSI).

To establish predetermination, Petitioners must show that FWS "irreversibly and irretrievably commit[ted] itself" to funding the CPW studies before the agency had completed its environmental analysis.  *Id*.  The record here shows that did not happen.

FWS expressly told CPW that it could not commit to funding until it had completed its NEPA review.  *See, e.g.*, AR_469 (June 3, 2016 email from FWS to CPW:  "we won't know if we can adopt the APHIS EA, until the NEPA process has been completed"); AR_670 ("grant approval is contingent upon completing the NEPA process").

As for FWS and CPW preparing for the possibility that FWS would adopt the EA and issue a FONSI:  Preparation is not predetermination.  The Tenth Circuit made that clear:

> We would not hold, therefore, that predetermination was present simply because the agency's planning, or internal or external negotiations, seriously contemplated, or took into account, the *possibility* that a particular environmental outcome would be the result of its NEPA review of environmental effects.

*Forest Guardians*, 611 F.3d at 715.

**B. FWS did not "rush" to adopt the EA without public comment.**

Petitioner suggest FWS "rushed" to adopt the EA because "CPW pressured FWS to rush through its NEPA process" "with a goal of having funding approved before the December 2016 CPW Commission meeting." Doc. 28 at 12. But the facts do not support Petitioners' theory. FWS did not issue its FONSI and fund the projects until February 27, 2017 – three months after the CPW Commission meeting. FONSI at 3719. And the record reflects that FWS encouraged an opportunity for public comment. *See, e.g.*, AR_1027; AR_1596; *supra* p. 20.

Petitioners insinuate that there was something nefarious about FWS, Wildlife Services and CPW meeting in person to discuss the NEPA process. But Petitioners' version of events does not hold up under scrutiny. Petitioners assert in their brief that "FWS informed CPW that it would provide the public with a 30-day comment period for adoption of the EA, after which CPW immediately requested a meeting with FWS and Wildlife Services to discuss whether they could 'avoid that.' AR_421." Doc. 28 at 12.

What the email at AR_421 actually says, however, is: "That points me in the direction of two separate EA processes, but if we have the discretion to avoid that, we should at least talk about it as a 3-way partnership." AR_421. Put in its proper context, "avoid that" is a comment about avoiding "two separate EA processes." There is nothing wrong with avoiding multiple EAs on the same project. CEQ's NEPA regulations require that agencies "shall reduce excessive paperwork," "shall reduce delay," and "eliminat[e] duplication" by adopting other agencies EAs. 40 C.F.R. §§ 1500.4(n), 1500.5(h).[7]

---

[7] Moreover, the EA was made available for a public comment period longer than 30 days between October 20, 2016 and November 25, 2016. *See* AR_1733.

As for meeting in person, the suggestion from a Wildlife Services employee that "Conversing by email on this complex subject is less than ideal.  Can we get together to discuss the process?" is benign.  AR_423.  NEPA can be complex; discussing a process can be useful.

Petitioners also point to another email from Wildlife Services (AR_479) that Petitioners claim "revealed that an adopting agency must circulate for public comment the NEPA document being adopted."  Doc. 28 at 13.  But that email is from a USDA employee, reporting on a conversation he had with a USDA NEPA Coordinator  AR_479.  Whatever this email might reveal about how USDA might approach adopting another agency's EA, it is not binding on how FWS – part of DOI – adopts other agencies' EAs.  DOI's process for adopting EAs is set forth in DOI's regulations.  And as shown in Part I above, FWS complied with those regulations.

### C.  The EA shows objectivity and good faith.

Petitioners claim that the EA lacks scientific integrity.  Doc. 28 at 28-29.  Again, the record shows otherwise.

DOI requires that the "environmental assessment must contain objective analyses that support conclusions concerning environmental impacts."  43 C.F.R. § 46.310(g).  CEQ requires agencies to use "high quality" information.  40 C.F.R. § 1500.1(b).  The EA more than lives up to these standards.

Throughout the EA, including in sections discussing the CPW plans, the EA objectively acknowledged and discussed data, including studies from a variety of perspectives.  For example, Wildlife Services stated that "experimental studies on the effects of predator control to manage mule deer populations … remains variable," EA at 2576, and cited a study criticizing research on lethal predator damage management.  EA at 2578.  Similarly, the EA noted that "[p]ast research

evaluating success of predator reduction to enhance ungulate populations has provided mixed results."  EA at 2581.

The objectivity of Wildlife Services' and FWS's analyses can be seen in their recognition that the result of the studies could lead to *less* predator management.  Both the EA and the FONSI state that "[i]f … neonate predation appears compensatory, predator management should be disregarded as a management option to enhance neonate survival and recruitment."  EA at 2581; FONSI at 3713 (same).

## CONCLUSION

Fish and Wildlife Services properly adopted the Environmental Analysis prepared by Wildlife Services.  The petition should be denied.


DATED at Denver, Colorado this 13th day of November, 2018.

> JASON R. DUNN
> United States Attorney
>
> s/ Jasand Mock
> ***Jasand Mock***
> Sarah Hunter Weiss
> Assistant United States Attorneys
> 1801 California Street, Suite 1600
> Denver, Colorado  80202
> Telephone:  (303) 454-0100
> Facsimile:  (303) 454-0404
> jasand.mock@usdoj.gov
> sarah.weiss@usdoj.gov
> *Attorneys for the Respondents*

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 13, 2018, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

asantarsiere@biologicaldiversity.org
lfriend@humanesociety.org
swilcox@wildearthguardians.org

s/ Jasand Mock
*Jasand Mock*

## <u>CERTIFICATE OF COMPLIANCE WITH WORD LIMIT</u>

This document complies with the 8,000 word limit set for Respondents' response brief in the Joint Case Management Plan.  Doc. 14 at 5 (as amended by Docs. 17, 21 and 27).  This document contains 7,984 words, excluding parts of the document exempted by Fed. R. App. P. 32(f).


s/ Jasand Mock
***Jasand Mock***