**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Chief Judge Marcia S. Krieger**

Civil Action No. 18-cv-00558-MSK

**CENTER FOR BIOLOGICAL DIVERSITY,
THE HUMANE SOCIETY OF THE UNITED STATES, and
WILDEARTH GUARDIANS,**

   **Petitioners,**

**v.**

**NOREEN WALSH, in her official capacity as Regional Director of the Mountain-Prairie
Region of the U.S. Fish and Wildlife Service,
DEB HAALAND, Secretary of the U.S. Department of the Interior,
AURELIA SKIPWIRTH, in her official capacity as Acting Director of the U.S. Fish and
Wildlife Service,
U.S. FISH AND WILDLIFE SERVICE, and
U.S. DEPARTMENT OF THE INTERIOR,**

   **Respondents.[1]**

---

## OPINION AND ORDER VACATING AGENCY ACTION

---

  **THIS MATTER** comes before the Court for resolution on the merits, in consideration of

the Administrative Record (**# 19**, as supplemented **# 23**), the Petitioners' Opening Brief (**# 28**),

the Respondents' Response Brief (**# 31**), and the Petitioners' Reply Brief (**# 32**).

## FACTS

  For decades, officials from Colorado Parks and Wildlife ("CPW") have worked with a

federal agency, the Wildlife Services division of the U.S. Department of Agriculture's Animal

and Plant Health Inspection Service (collectively, "APHIS") to address issues of "wildlife

---

[1]  The Court has *sua sponte* modified the caption to reflect current officeholders of the
positions at issue here.

damage management" .  These are situations in which wild predators (such as coyotes, mountain

lions, bears, and others) have caused damage to livestock, domestic animals, people, and

agricultural resources.  Among the services that the agencies coordinate is "predator damage

management," namely activities that involve killing nuisance predators throughout the state.

In or about October 2016, APHIS, in cooperation with CPW and other agencies, issued a

draft Environmental Assessment ("EA"), addressing whether the existing practice of predator

damage management should be continued and whether continuation of the practice would have

significant environmental impacts warranting the preparation of an Environmental Impact

Statement ("EIS") under federal law.  AR 1735, 1783. [2]  After giving notice and soliciting public

comment on the draft EA, in January 2017, APHIS issued a final EA and a Finding of No

Significant Impact ("FONSI"), in which it decided to continue its involvement in the predator

damage management activities.

Separately, the Pittman-Robertson Wildlife Restoration Act ("Wildlife Act"), 16 U.S.C.

§669c(e), authorizes the Secretary of the Interior to allocate certain federal funds to states to

support state-run wildlife conservation and restoration programs.  To apply for such funding the

state must submit a comprehensive plan addressing various components, including providing "an

opportunity for public participation in the development" of the contemplated program.  16

U.S.C. § 669c(e)(2).  If the Secretary approves the program, the Department of the Interior can

allocate up to 75% of the cost of developing and implementing that program.  16 U.S.C. §

669c(e)(3).

---

[2]      Citations to AR__ refer to the referenced page of the supplemented Administrative
Record, Docket # 23.

For decades, CPW has been tracking populations of mule deer, a popular game species. CPW observed that since 2008, such populations have been in decline.  In 2016, CPW officials hypothesized that predation is a possible explanation for some of the decline, and proposed a research program to study the effects of predation on mule deer populations.  AR 94.  The research project involved "predator control efforts" – essentially, the killing of some bears and cougars in the study area over a 3-year period to compare mule deer survival rates to those where no predator control occurred.  AR 96.  In January 2016, CPW officials reached out to the U.S. Fish and Wildlife Service ("FWS"), a division of the U.S. Department of the Interior, to request funding for the contemplated predator control research project under the Wildlife Act.  AR 94. The research project was to take place in a portion of the Piceance Basin in northwestern Colorado and would require APHIS to kill a then-unspecified number of black bears and cougars[3] during May and June of 2016, 2017 and 2018.  AR 97-98.

FWS representatives responded favorably to the initial request.  On March 16, 2016, they wrote to CPS officials stating "when you speak with APHIS, would you please ask them if they've done an EA [ ] for the work they are conducting.  I'm hoping we might be able to adopt their NEPA document since they are another federal agency."  AR 129.  Because APHIS' 2016 draft EA did not yet exist, an APHIS official sent a copy of a 2005 EA that APHIS had prepared in conjunction with its ongoing predator damage management activities.  AR 131, 136.  CPW continued to refine the Piceance Basin proposal, eventually estimating that 5-10 cougars and 10-

---

[3]      "Cougar" and "mountain lion" are alternative names for the same species (*Felis concolor*, sometimes *Puma concolor*).  *See e.g.* AR 97, 772, 1743.  Documents in the record use both terms interchangeably (sometimes within the same document).  *See e.g.* AR 2016 ("To suppress cougars we would increase lion harvest which will have a significant impact on the density of cougars. . . .").  In an effort to maintain clarity, this Court will generally refer to the animals as "cougars," except when quoting from sources in the record that use "lion" or "mountain lion."

15 bears would be killed each year, with the possibility of those numbers increasing to a maximum of 15 cougars and 25 bears per year.[4]  AR 321-22.

At some point in time, CPW decided to also pursue a second, somewhat similar research project in the Arkansas River valley are south of Canon City.  AR 731.  That project proposed to "suppress [mountain] lion populations" in two management units over a 9-year period.[5]  In unit D-16, cougar populations would be reduced by "approximately 50% of the potential population" over a 3-year period, and the reduced population sustained for three years, after which it would be allowed to return to normal numbers.  In unit D-34, the cougar population would be unaffected for a 6-year period (serving as a control group during the D-16 experiment and recovery), after which the cougar population in D-34 would be reduced "similarly to years 1-3 in D-16" before being allowed to return to normal.  AR 736.

On May 10, 2016, representatives of CPW, FWS, and APHIS met to discuss the need for an EA for the CPW research projects, as required by the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*  AR 387.  Anticipating that "the probability of public controversy is high," the parties concluded that more streamlined procedures would not be possible and that an EA would likely be required.  The various agencies all anticipated that, to reduce duplication of effort, APHIS would complete their in-progress work on their forthcoming 2016 EA governing its predator damage management activities statewide and would include details about CPW's intended research projects in that EA, and that FWS would then evaluate

---

[4]     The proposal specified that if "a lactating black bear or cougar is killed, accompanying cubs/kittens will be humanely euthanized" as well.  AR 322.

[5]     It is not clear to the Court whether the cougars in the Arkansas River project would be killed primarily by recreation hunters via increased issuance of cougar-hunting permits, whether APHIS would be contracted to specifically hunt cougars, or some combination of both.

and adopt that EA as part of its own NEPA obligations for assessing the request for Wildlife Act

funding.  The agencies anticipated that CPW would hold public meetings and solicit comments

about the projects, and that such notice and comment proceedings would suffice for FWS'

purposes as well.   AR 387.

State agencies were eager to complete the environmental assessment process  and obtain

FWS approval by a December 4, 2016, in order to implement the programs during the 2017 mule

deer birthing season.  FWS stated in contemporary correspondence that it would need 60 days

from the release of the APHIS EA in order for FWS to adopt it.  AR 389.  Colorado state

officials asked whether there was  "anyway to reduce that to something closer to 30 days?,"

observing that, with a target date of November 2016 for FWS approval, APHIS would be

required to publish its EA by early September, and CPW "would have to conduct all its public

outreach prior to early September."  AR 392, 394.  Believing that FWS would have to allow a

separate 30-day notice and comment period before adopting the APHIS EA, FWS

representatives considered the possibility of being a "cooperating agency" on APHIS' EA.  AR

439.  In June 2019, an APHIS employee conferred with the agency's NEPA coordinator and was

advised of the following:

> The difference between "adopting" versus "cooperating agency" is
> for one agency to adopt another agency's NEPA without being a
> cooperating agency listed on the title page requires the adopting
> agency to put their name on the NEPA document and then put the
> same document out for public comment a second time.  The
> adopting agency then can issue a decision document.
>
> The cooperating agency process has all the cooperating state and
> federal agencies listed on the title page and the federal agencies'
> proposed actions listed in the alternatives.  There is one public
> comment period and the cooperating federal agencies can issue a
> separate or joint decision document.  After the public comment
> process, the second agency can now adopt the primary agency's
> NEPA and issue a decision document without a separate public

> comment period. . . . This process saves at least 30 days by
> avoiding the second comment period.

AR 479.

In October 2016, APHIS released its draft EA for public comment.  AR 1735.  Notably, FWS was <u>not</u> listed on the title page as a cooperating agency, although the APHIS EA included some discussion and analysis of both proposed CPW research projects.  APHIS issued its final EA and FONSI on January 19, 2017.  AR 2542, 2543 (FONSI), 2553 (Final EA).

On February 27. 2017, FWS "adopted in part" the APHIS EA, namely, adopting without modification that portion of the APHIS EA that discussed the two predator control projects.  AR 3712. At the same time, FWS also issued its own FONSI, approving CPW's application for Wildlife Act funding of the project.  AR 3327.  FWS did not solicit any additional public notice on the APHIS EA before adopting it.

The Plaintiffs commenced this action, seeking review of FWS' decision to adopt the APHIS EA under the Administrative Procedure Act ("APA"), 5 U.S.C. § 500 *et seq*. They contend that the FWS' decision to approve funding for the project without separately conducting an EA or allowing public notice and comment before adopting the APHIS EA violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq*.  More specifically, the they argue that: (i) pursuant to 40 C.F.R. § 1506.3(b) and (c), FWS was not permitted to simply adopt the APHIS EA because FWS was not a cooperating agency on that EA and because the projects contemplated by FWS were not "substantially the same" as the broad predator management activities contemplated by the APHIS EA, and thus, FWS was required to circulate the APHIS final EA as a <u>draft</u> FWS EA and allow notice and comment before approving it; (ii) the APHIS EA is incomplete, in that it fails to provide baseline population estimates of black bears and cougars in the project areas, making it impossible to adequately assess the

environmental effects of killing portions of those populations, that it does not adequately discuss the environmental effects that will result from the removal of portions of the predator population in the project areas, and that it did not consider scientific research that discounts the effects that predation has on deer populations; (iii) that FWS failed to consider a range of alternatives, such as funding the projects at less than the requested 75% level; and (iv) that under NEPA, FWS should have been required to prepare a full Environmental Impact Statement ("EIS") instead of an EA because the research projects are controversial, involve uncertain and unknown risks, and because the projects could have substantial cumulative impacts.

## ANALYSIS

### A. Statutory background

#### 1. APA

The APA provides the mechanism by which courts review final agency actions.  Under the APA, the Court may set aside an agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  A decision is arbitrary or capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency" or where the action "is so implausible that it could not be ascribed to a different in view or the product of agency expertise." *High Country Conservation Advocates v. U.S. Forest Serv.*, 951 F.3d 1217, 1222 (10th Cir. 2020).  The Court affords the agency's decisionmaking a presumption of validity and considerable deference, and the burden is on the party challenging it to demonstrate that the decision is arbitrary and capricious. *Id.; Defenders of Wildlife v. Everson*, 984 F.3d 918, 934-35 (10th Cir. 2020).

2. <u>NEPA</u>

NEPA requires federal agencies to analyze environmental consequences before initiating actions that potentially affect the environment.  The agency must first conduct an EA to determine whether the action is likely to "significantly affect the quality of the human environment."  42 U.S.C. § 4332(2)(C).  If the agency determines that the project will likely have significant environmental impacts, it must proceed to prepare a comprehensive EIS.  40 C.F.R. § 1501.3(a)(3), 1502.1 *et seq.*  If the agency determines that the project is <u>not</u> likely to have significant environmental effects, it may issue an EA and FONSI.  40 C.F.R. § 1501.6.  The agency must give the public notice of the EA and FONSI (and underlying documentation) and solicit information and comment from the public on the documents and proposed action before proceeding to finalize its decision.  *Id.*; 40 C.F.R. § 1506.6.

NEPA describes only <u>procedural</u> requirements; so long as those requirements are followed, the Court does not concern itself with the wisdom of the agency's decisionmaking. *New Mexico ex. rel. Richardson v. Bureau of Land Management*, 565 F.3d 683, 704 (10th Cir. 2009).  As the Supreme Court has stated, NEPA "prohibits uninformed – rather than unwise – agency action."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989).  The touchstone of the Court's inquiry is whether the agency "took a hard look at information relevant to the decision," that is, whether the agency "did a careful job at fact gathering and otherwise supporting its position."  *Richardson,*, 565 F.3d at 704.

**B.  Plaintiffs' contentions**

1. <u>Adoption of another agency's EA</u>

Before the Court embarks on this portion of the analysis, it must first determine what regulatory scheme controls.  NEPA's regulatory scheme is drafted by the Council on

8

Environmental Quality ("CEQ"). In 2020, the CEQ updated the existing NEPA regulatory scheme in several ways pertinent to this analysis. *See* 85 Fed. Reg. 43304-1 (Jul. 16, 2020). For example, 40 C.F.R. § 1506.3 specifically addresses situations in which an agency may adopt analytical documents from other federal agencies. Prior to the 2020 Amendments, when the FWS was making its decision, subsection (a) of that regulation read:

> (a) An agency may adopt a Federal draft or final environmental impact statement or portion thereof provided that the statement or portion thereof meets the standards for an adequate statement under these regulations.

The 2020 amendments broadened the subsection to clarify that agencies could adopt EAs as well as EISs from other agencies:

> (a) An agency may adopt a Federal draft or final environmental impact statement, **environmental assessment, or portion thereof, or categorical exclusion determination** provided that the statement, **assessment, portion thereof, or determination** meets the standards for an adequate statement, **assessment, or determination** under the regulations . . . . (Emphasis added).

Likewise, in the pre-2020 version of the regulations, subsection (b) addressed the adoption of another agency's EIS:

> (b) If the actions covered by the original environmental impact statement and the proposed action are substantially the same, the agency adopting another agency's statement is not required to recirculate it except as a final statement. Otherwise the adopting agency shall treat the statement as a draft and recirculate it

In 2020, subsection (b) remained largely the same as it related to EISs, but a new subsection (c) was added to address adoption of another agency's EA:

> (c) If the actions covered by the original environmental assessment and the proposed action are substantially the same, the adopting agency may adopt the environmental assessment in its finding of no significant impact and provide notice consistent with § 1501.6 of this chapter.

FWS argues that because it was adopting the APHIS EA, not an EIS, the pre-2020 version of 40 C.F.R. § 1506.3, which required adopting agencies to "recirculate" the environmental document in certain circumstances, did not apply.[6]  Instead, FWS argues that (pre-2020), no specific regulatory provisions address the adoption of another agency's EA.  In the absence of a regulatory provision, the FWS contends that it was required only to comply with the CEQ that "merely encourages agencies to put in place a mechanism for adopting environmental assessments prepared by other agencies".  In such context, the FWS abided by the Department of the Interior's own internal guidance for approving such adoptions.

The Court rejects FWS' arguments for several reasons.  First, although APA cases focus on the decision-making process at a fixed point in the past, courts have recognized that they "[are] not limited to determining whether an agency's action was 'reasonable' in light of the law as it existed at the time of its decision; instead, the APA requires a court to determine whether a decision is 'in accordance with law' as it exists at the time of review."  *New York v. U.S. Dept. of Health and Human Servs.*, 414 F.Supp.3d 475, 535 (S.D.N.Y. 2019), *quoting Georgetown Univ. Hosp. v. Bowen*, 698 F.Supp. 290, 297 (D.D.C. 1987).  By that standard, the Court assesses FWS' decision based on the regulations as they currently exist.  Those regulations

---

[6]     FWS' argument appears to implicitly concede that its decision to fund the research projects under the Wildlife Act is not "substantially the same" as the decision by APHIS to continue statewide predator damage management activities.  If FWS believed the actions were substantially similar, it could concede the point that an EA and EIS are functionally similar and rely on the fact that the regulation allows it to issue the EA/EIS as a "final document" in such circumstances.  Regardless, for the reasons discussed below, the Court finds that the two agencies' actions are not similar in any event.

unambiguously allowed FWS to adopt the APHIS EA as a final decision of FWS only if the agency actions at issue were "substantially the same."  As discussed below, they were not.

Second, even if the Court were to apply the pre-2020 version of the regulations, the Court agrees with the Plaintiffs that the old version of 40 C.F.R. § 1506.3(a) and (b)'s references to adoption of an "environmental impact statement" are elastic enough to address the circumstances under which an EA could be adopted as well.[7]  *See Anacostia Watershed Soc. v. Babbitt*, 871 F.Supp. 475, 485 (D.D.C. 1994) ("Section 1506.3 of the NEPA regulations specifically addresses the circumstances in which one agency may adopt an environmental impact statement issued by another agency. The provision also has been interpreted to allow an agency to adopt an environmental assessment that another federal agency has prepared, so long as the agency adopting the assessment reviews it and accepts responsibility for its scope and content"), *citing North Carolina v. FAA*, 957 F.2d  1125, 1130 (4th Cir. 1992).  Although FWS is correct in noting that EAs and EISs are distinct types of documents, they both serve the same basic purpose, differing largely in their comprehensiveness.  If the regulations contemplated a situation in which one agency could conclusively adopt the other's comprehensive EIS based simply on findings that it is "adequate" and that the actions at issue are "substantially the same," there is no apparent reason why an agency should not be able to adopt an EA based on the same findings.[8]  In that

---

[7]     As noted above, an APHIS employee consulted with that agency's national NEPA coordinator and received the same advice: that an agency "adopting" an EA would be required to re-issue the document for additional notice and comment before making that adoption final.  AR 479.

[8]     FWS argues that, in the absence of pre-2020 regulatory guidance governing the adoption of other agencies' EAs, that practice is governed by internal Department of the Interior regulations.  FWS argues that those internal regulations allow adoption if the adopting agency independently reviews the assessment and finds that it "complies with . . . relevant provisions of the CEQ regulations and with other program requirements."  *Citing* 43 C.F.R. § 46.320(a).  Assuming that this standard is the equivalent of 40 C.F.R. § 1506.3(a)'s requirement that an

sense, the 2020 amendments to the regulation merely confirm what is a common-sense reading of the pre-2020 version of the regulations.

Third, as discussed below, even if FWS is correct and it was permissible for it to finally adopt the APHIS EA based solely on a finding that it otherwise complied with NEPA, the Court finds that conclusion to be erroneous,  thus warranting reversal and remand of the decision.

Under either the 2020 or pre-2020 versions of 40 C.F.R. § 1506.3, adoption of another agency's EA turns, in part, on whether the agencies' proposed actions are "substantially the same." There can be little argument that the action analyzed in the APHIS EA is far broader than the research projects proposed by CPW.

As framed by APHIS, the query being investigated in its EA is "should [predator damage management], as currently implemented, be continued in Colorado?"  AR 1783.  The predator damage management program under consideration is primarily focused on the protection of livestock and agricultural resources against predation: APHIS reports that "an annual average of 4,930 incidents of damage caused by mammalian predators" had been reported over the last 5 years, and that 76% of those incidents concerned the need to protect agricultural resources and an additional 18% involved requests to protect human health and safety.  AR 1750-51.  Thus, 94% of APHIS' activities are unrelated to the type of wildlife predation addressed by CPW's research. APHIS does occasionally respond to requests to address predator damage to "natural resources, including [threatened & endangered], sensitive, and game species," such as mule deer, with an annual average of 167 incidents falling into this category (about 3.3% of its nearly 5,000 annual

---

adopted EA/EIS be "adequate," the only difference between pre-2020 adoption requirements and the current requirements is that the actions be "substantially the same."  The Court does not understand FWS to argue that internal Department of the Interior regulations would allow it to adopt another agency's EA/EIS that analyzed a substantially different proposed action.

incidents).  However, 93% of <u>those</u> incidents "were to protect Gunnison sage-grouse from coyotes and other predators," leaving perhaps a dozen instances a year involving other species. AR 1759.  The EA notes that APHIS has also "responded to requests to protect piping plovers from predation by coyotes, mule deer from predation by coyotes and mountain lions, and bighorn sheep from predation by mountain lions," but does not enumerate or otherwise describe the frequency of these types of activities.[9]  *Id.*  A fair interpretation of the APHIS EA is that APHIS' predator damage management activities rarely involve addressing issues relating to predation of mule deer by cougars and bears.

The parties have not briefed the standards that govern a determination of whether a contemplated project is "substantially similar" to another one for purposes of 40 C.F.R. § 1506.3(c).[10]  But under the circumstances present here, nuanced examination of the contours of that standard seems unnecessary.  There can be little argument that the project examined by the APHIS EA is far broader than, and only tangentially related to, the research projects proposed by CPW.  Both projects involve mammalian predation, but the similarities largely end there. APHIS's analysis was focused on the continuation of a longstanding statewide predator management program that was primarily reactive to reports of damage to agricultural resources and human health, only sporadically involved in predation of wildlife resources, and rarely called

---

[9]      Table 2 in the EA lists one reported instance of predation of mule deer, and in that case, the predator in question was a coyote, not a cougar or bear.  AR 1752.

[10]      *See* 85 Fed.Reg. at 43336 (Jul. 16, 2020) (discussing amendments to the regulations giving examples of "substantially similar" actions as "when two agencies are engaging in similar activities in similar areas like small-scale prescribed burns, ecological restoration, and small-scale land management practices. Another example is when one agency's action may be a funding decision for a proposed project, and another agency's action is to consider a permit for the same project").

upon to address predation of mule deer.[11]  By contrast, the CPW research project that FWS was

considering was proactive, temporary, and focused on specific predators (apparently ignoring the

predator identified in the one mule deer incident reported to APHIS) in small, specific locations

in the state.  APHIS was not being called upon to manage or consult with CPW on the design or

implementation of the research projects as a whole.  See e.g. AR 2592 ("[APHIS] mostly

responds to requests concerning agricultural related damage for [cougar and bear] and some

human health and safety threats.  [APHIS] relies on CPW to determine what the management

objectives are in each [data analysis unit] and ensure that management objectives are met.").

Rather, by all appearances, APHIS' involvement with the research projects would be limited to

contracting with CPW to provide resources to locate and kill the number and kind of predators

specified by CPW.  *See e.g.* AR 2801 (regarding the Piceance Basin project, "[b]ecause this area

consists primarily of private lands limiting hunter access and spring hunting seasons are

currently unavailable, [APHIS] will be contracted to address spring predator reduction efforts").

Under these circumstances, the Court finds that the Plaintiffs have shown that the one-off

research projects contemplated by CPW were not "substantially the same" as the continuation of

APHIS' broad predator damage management activities as analyzed in the APHIS EA.  Thus, the

Court agrees with the Plaintiffs that under 40 C.F.R. § 1506.3(c), FWS was not permitted to

simply adopt the APHIS EA and issue its own FONSI.  Rather, consistent with 40 C.F.R. §

---

[11]     Many of APHIS' predator management activities are entirely non-lethal, involving
consulting with farmers and ranchers on issues of animal husbandry and guard animals, assisting
in the planning and construction of fencing and netting, and engaging in non-lethal predator
management activities such as frightening devices, chemical repellents, capture and relocation,
among others.  AR 1836-37.  These activities have no connection whatsoever to the activities
contemplated by the CPW research projects, which call only for lethal removal of the selected
predators.

1506.3(b) (pre-2020) or (c) (post-2020), the Court finds that FWS was required to promulgate the APHIS EA as the FWS' own <u>draft</u> EA and solicit additional public comment on the proposal to fund the research projects.  FWS' failure to do was not in compliance with law, requiring that the FONSI and approval of the funding under the Wildlife Act be vacated and remanded for further consideration.[12]

B.  <u>Adequacy of the APHIS EA</u>

The Plaintiffs argue that, even if properly adopted by FWS, the APHIS EA was inadequate to discharge FWS' duties under NEPA.  They argue that the APHIS EA contains the following defects: (i) the EA does not provide a population estimate for cougars or black bears in the Piceance Basin area, making it impossible to assess the environmental effects of killing a predetermined number of those predators; (ii) the EA anticipates that the predator killing under the research projects would be at "similar levels" to hunting take, such that "the potential effects on biodiversity would be low," when, in fact, the projects at issue anticipate significantly higher levels of take than historic hunting levels; (iii) the EA approximates cougar populations in the

---

[12]    FWS argues that, even if it erred in issuing the EA and FONSI without soliciting further public comment, the error was harmless because APHIS had already discussed the parameters of the research projects in its own EA and solicited and received public comment on that subject. APA violations are subject to "harmless error" analysis.  5 U.S.C. § 706; *Shinseki v. Sanders*, 556 U.S. 396, 406 (2009).  For many of the same reasons discussed below with regard to defects in the APHIS EA, the Court agrees with the Plaintiffs that a lack of opportunity to address the merits of the CPW research projects as a standalone decision, rather than a component of a much broader and mostly-unrelated EA, substantially affected the Plaintiffs' rights to comment upon the decision by FWS to approve Wildlife Act funding.

The parties have not supplemented their briefing to address, and thus, the Court makes no findings as to, whether the age of this case makes a remand for further consideration meaningful at this point.  It is not clear from the record whether CPW commenced the research projects notwithstanding this litigation and, if they did, whether the projects are proceeding apace.  For at least some portion of those projects, notably the Arkansas River project in unit D-16, the majority of the cougar-killing, scheduled for the first three years of the project, would effectively be complete if the projects commenced promptly upon the schedule set forth in the APHIS EA. *See e.g.* AR 2813 (anticipating cougar suppression "[b]eginning in 2017").

Arkansas River area based solely on land area approximations, rather than accounting for population variations due to habitat, human activity, and prey availability; (iv) the EA fails to adequately discuss the effects that will result from removing 50% (or more) of cougar populations in the Arkansas River project's study areas and erroneously states that cougar populations would only be reduced by "up to 36% of the local population," contrary to the study proposal; (v) the EA fails to consider the cumulative effects of the project on cougar cubs orphaned by the killing of their mother, and the potential effects of other forms of cougar mortality that might increase during the projects, such as vehicle collisions or disease; and (vi) the APHIS EA failed to consider scientific studies that determined that lethal predator control may not reduce predation and failed to adequately respond to public comments raising this issue.

The APHIS EA's discussion of the CPW research projects is mostly found in the "Chapter 1 – Purpose and Need for Action" section.  AR 2574 -2580 discuss mule deer populations generally and research on the effect of predation on those populations.  The CPW research projects are introduced beginning at AR 2580, with the statement "[APHIS] would work with CPW, [ ] FWS, and other agencies when requested to participate in monitoring and research actions to determine appropriate management actions to meet population objectives.  Some potential research projects summarized below are to evaluate management prescriptions to increase mule deer populations in central and western Colorado," citing to Appendices A and B, the CPW researchers' proposals for the projects.  The Piceance Basin study is recited at AR 2580-82, and the Arkansas River project is discussed at AR 2582-2585.[13]  As best the Court can determine, the EA does not directly or specifically discuss the environmental consequences of

---

[13]      These discussions are essentially verbatim quotes from the introductory sections of the study documents themselves in the Appendices and contribute no additional information or data.

the proposed research projects thereafter.  Rather, the impact of the research project on, say, cougar populations is discussed generally, assessing the <u>statewide</u> impact of APHIS' overall activities; impacts from the research projects themselves are often addressed as vague asides to the effect that "some additional impacts may occur."  *See* AR 2676 ("[APHIS] took an average of 12 mountain lions per year . . . Under [the Proposed Alternative – continued predator management activities], mountain lion take by [APHIS] <u>may increase</u> over the FY 10-14 levels due to additional resources and <u>projects to protect mule deer from mountain lion predation</u>.  We anticipate that [APHIS] would take no more than 40 mountain lions in any year, which is 0.8 of the statewide population.  This level of take is expected to result in a low impact on mountain lions locally, and no impact on the statewide mountain lion population") (emphasis added).   For example, at AR 2683, the EA offers a "Summary of Direct, Indirect, and Cumulative Impacts to targe wildlife populations under Alternative 1," the proposed continuation of APHIS' activities.  That section explains that [APHIS'] take is less than 0.3% of the estimated statewide population of mountain lions . . . We anticipate similar levels of take under [the continued action alternative].  Therefore, impacts to these predatory mammal populations from [APHIS activities] is negligible at the statewide and regional levels.  <u>However, there may be short-term impacts to localized coyote, black bear, and mountain lion populations</u>."  (Emphasis added.)  One would expect a detailed examination of those "short-term impacts" resulting from the removal of up to 50% of cougar populations in the Arkansas River project area.  But the APHIS EA goes on to recite only that "Indirect impacts may include increased localized immigration and fecundity for . . . black bear and mountain lions where [APHIS] may substantially decrease local populations."  *Id.*  A range of potential environmental effects resulting from cougar suppression is easily conceivable, ranging from the expected results of the study – increased mule deer populations in

the study area and the immigration of new cougars into the study area, and the attendant environmental effects resulting therefrom – to effects on other populations subject to or depending upon cougar predation (such as increased opportunities for other predator species like coyotes to flourish), to potential increased vulnerability of the remaining cougar populations to unpredictable events like disease or wildfire.

It appears to the Court that the skeletal discussion of effects resulting from the proposed CPW research projects in the APHIS EA is the result of an attempt to shoehorn the CPW projects into an EA process that was only fleetingly related to the study objectives.  It is clear from the record that CPW and FWS wished to expedite the application for Wildlife Act funding and instead of embarking upon an EA process devoted to specifically examining those projects, the agencies instead decided to hitch a ride on the APHIS EA that was already in progress, even though that APHIS project(s) being analyzed had only tenuous links to the CPW studies.  As a result, the APHIS EA extensively analyzes APHIS' own activities statewide, but often gives cursory consideration to the effects of the CPW studies, indicative of APHIS' role as a peripheral player in those studies.

Turning to the particular issues raised by the Plaintiffs, the Court agrees that the APHIS EA provides no discussion of the baseline estimates of cougar populations in the Piceance Basin study area.  The discussion of that aspect of the research project at AR 2580-82 is highly generalized, reciting neither estimates of cougar populations in that area nor the study parameters identifying how those populations are to be reduced.  The Piceance Basin study is not referred to again in the body of the EA, leaving only Appendix A, CPW's study proposal, to address those issues.  The predator control portion of that appendix is found at AR 2800-01, proposing that removal of "5-10 cougars and 10-20 black bears annually will provide the desired predation rate

reduction of $\geq 20\%$," but it is unclear what portion of cougar and bear populations in the study area that those numbers represent. FWS argues that cougar and bear populations are set forth in the EA, at AR 2612 and 2610 respectively. But those passages refer only to general statewide averages, not population estimates for the Piceance Basin study area. For example, AR 2612 explains that "Published mountain lion densities, based on a variety of population estimating techniques, range from a low of about $1/100 \text{ mi}^2$ to a high of $24/100 \text{ mi}^2$. . . In Colorado, mountain lions were estimated to have a density of $4\text{-}10/100 \text{ mi}^2$. . . ." It may be that cougar populations in the Piceance Basin are consistent with statewide averages or it may be that, for various reasons, they might be higher or lower than the averages. But the EA makes no findings on that point.[14] Without any stated baseline estimate of cougar and bear populations in the study

---

[14]     FWS argues that one sentence in the proposal for the Piceance Basin project provides estimates for bear and cougar baseline populations: "While the objective is to reduce cougar and black bear densities in this focal area, overall densities at the much larger Data Analysis Unit (DAU) scale (representing population level biological units) should be minimally influenced; the predator treatment summer range area represents 6% mountain lion DAU L-7 and 16% of black bear DAU B-1." AR 2801. It is entirely unclear to the Court – and thus, the public – what the reference to "6% mountain lion DAU L-7 and 16% of black bear DAU B-1" is describing. Presumably, a DAU is a <u>geographic</u> unit of area, and DAU L-7 and DAU B-1 are referring to specific geographic areas. (*i.e.* units L[ion]-7 and B[ear]-1). Thus, the percentages would appear to be the percentage <u>area</u> of those units that are contained within study area where the Piceance Basin project will take place. As units of area, these percentage figures give no insight as to baseline population data. To the extent that a DAU is something else – a specified population size of a pack of animals, say – the record still fails to provide the necessary data to convert the listed percentages to an understanding of baseline populations.

    FWS also argues that CPW provided population baseline data to the Plaintiffs in December 2016, in response to public comments by the Plaintiffs, by posting certain information on CPW's website. FWS provides a link to that response and suggests that the Court take judicial notice of the response and its contents. The Court declines to do so for several reasons. First, and perhaps most simply, the link provided in FWS' brief is no longer accessible, making it impossible for the Court – much less the public – to now confirm what information was presented at the time. Second, relatedly, that information lives outside the administrative record in this case, making it particularly unsuitable to demonstrate that FWS adequately discharged its obligations under NEPA. Third, the fact that certain information critical to the NEPA analysis was published outside the EA defeats the purpose of the EA as a comprehensive public document explaining the reasons behind an agency's actions. Persons who wish to review the

area, it is impossible for FWS to assess the degree to which the proposed study seeks to reduce those populations, and thus, it is impossible to ascertain how such a reduction would result in environmental effects.

The Court also agrees with the Plaintiffs that the EA inaccurately recites the study parameters it proposes to assess.  It is clear that the Arkansas River project contemplates a "harvest rate of approximately 50% of the potential population" in each of the two study areas during the height of the study period.  AR 2583.  Yet in discussing the cumulative impact of the proposed alternative, APHIS' EA anticipates "localized take up to 36% of the local [cougar] population," apparently referring to the CPW research projects.  AR 2676 (emphasis added).  FWS' response seems to concede that the reference to a 36% cougar population take is error, but suggests it is no more than a typographical one: "in one place in the EA, [APHIS] referred to local mountain lion harvest of 36% while the CPW Arkansas River plan referred to a harvest up to 50%.  But as discussion of these other recovery studies in the EA shows, FWS . . . considered mountain lion population recovery after harvest rates of 50%."  But the reference appears to be more than just a typographical error: on that same page, the APHIS EA twice relies on a 36% figure as reflecting documented permissible thresholds for cougar population reductions.  AR 2676 ("A localized population can recover to pre-harvest levels in 9 months when 36% of the local population is harvested. . ."; "Increased localized mountain lion harvest may be conducted to protect mule deer in Colorado at rates of up to 30% of the local mountain lion population.")  FWS is correct that, at other points in the EA, APHIS cites research suggesting that cougar populations can recover from reductions of at or near 50%.  AR 2675 (citing studies finding

---

historical basis for the FWS' decision by turning to the EA will find only part of that rationale disclosed therein.  As such, the Court declines FWS' invitation to take judicial notice of the extra-record evidence.

populations "rapidly replace annual losses" under "30%-50% removal"); 2676 (recovery to pre-harvest levels in 31 months where 47% of the population is removed).  Thus, it is not necessarily clear to the Court that the EA's reference to analyzing cougar reductions of up to 36%, not 50%, is necessarily a mere typographical error and not a defect in the analysis.  And even if it is, that error merely highlights the problem with FWS' hasty adoption of APHIS' EA.  Had FWS circulated the EA for further public comment, it is possible that a commentor would have drawn FWS' attention to the alleged typographical error, allowing FWS to correct it and ensure that a correct analysis was performed.

Finally, the Court agrees with the Plaintiffs that the APHIS EA, adopted by FWS, failed to adequately consider certain items of predator management research in the context of the CPW studies.  For example, during the comment period, a commentor asked APHIS to consider research by Bradley Bergstrom, standing for the general proposition that "Lethal predator control is not effective at reducing depredation in the long term."  "License to Kill: Reforming Federal Wildlife Control to Restore Biodiversity and Ecosystem Function," Conservation Letters, Vol. 7, Issue 2 (2013), https://conbio.onlinelibrary.wiley.com/doi/abs/10.1111/conl.12045, cited at AR 2772.  In the EA, APHIS rejects the applicability of the Bergstrom findings to the proposed action, explaining that "the goal of [APHIS'] actions is to reduce damage, not to cause long-term reductions in native predator populations. . . Because Bergstrom addresses the long-term reductions in predator populations, while the purpose and need of this EA and the proposed alternatives specifically contemplate short term reductions with impacts lasting less than one year, the Bergstrom article is inapposite."  AR 2755-56.  This conclusion might be accurate for the types of predator control activities APHIS generally engages in – isolated and reactive responses to particular predator incidents.  But that response fundamentally misconstrues the

21

operation of the CPW studies, both of which hardly called for "short term reductions" of predator populations "with impacts lasting less than one year." The Arkansas River study, for example, contemplated maintaining suppression of cougar populations in each study area for a period of six years. This is indicative of the APHIS EA's focus on APHIS' normal activities and its unsuitability as a vehicle for analyzing the peculiar characteristics of the proposed CPW studies. An EA that sought to address the soundness of CPW's request to conduct long-term predator reduction studies is one that would give greater consideration to the Bergstrom research.

Accordingly, the Court finds that the APHIS EA, which FWS adopted without modification, failed to adequately analyze the effects of the proposed CPW studies. As such, FWS' FONSI and decision to approve Wildlife Act funding for the CPW studies was arbitrary and capricious, warranting reversal and remand.

C. Remaining issues

The Plaintiffs offer two further arguments: that FWS should have considered a range of alternatives, such as funding the CPW studies at less than the 75% rate that was requested, and that FWS should have prepared an EIS instead of an EA because the proposed studies were controversial and involved highly uncertain environmental risks. Because the Court remands the action to FWS to conduct a more complete and focused EA addressing the proposed CPW studies, any ruling on these issues would be simply advisory.

**CONCLUSION**

For the foregoing reasons, having considered the Administrative Record (**# 19, 23**) and the parties' briefing, the Court finds that FWS' FONSI and decision dated February 27, 2017 was arbitrary and capricious under the APA. The Court **VACATES** that FONSI and decision and **REMANDS** the matter to the FWS for further consideration consistent with the findings in

this Opinion.  The Clerk of the Court shall enter judgment in favor of the Plaintiffs and close this case.

Dated this 30th day of March, 2021.

**BY THE COURT:**

Marcia S. Krieger
Senior United States District Judge